Breitbl, J.
The controversy arises from the acquisition by Cowles Communications, Inc., of a small but successful test book publishing company and the ensuing employment by separate agreement of its principal, Budman. In their action for damages for wrongful discharge and rescission for fraud plaintiffs, Budman and others, appeal.*
The' trial court dismissed the fraud causes of action but-awarded plaintiff Budman damages of $87,503.99 for breach of the employment agreement. On cross appeals, the Appellate *5 Division modified, one Justice dissenting, and dismissed the cause of action for wrongful discharge, thus denying plaintiffs any relief.
The principal issues turn on alleged insubordination by Bud-man and misrepresentations of intention by Cowles in acquiring the Budman enterprise.
With respect to the cause of action for wrongful discharge the weight of the evidence sustains the finding by the Beferee of wrongful discharge and the absence of inexcusable insubordination on the part of Budman. Despite plaintiffs’ contentions to the contrary, fraud was not made out as a matter of law, and in the light of the affirmed findings of fact by the courts below, there is no further power to review in this court. Consequently, the order of the Appellate Division should be modified to reinstate the cause of action for wrongful discharge, and otherwise affirmed as to the dismissal of the causes of action for fraud.
Budman, with 30 years’ experience as a school teacher and college instructor, began publishing examination test manuals on a part-time basis in 1954. In 1961, by which time he was publishing several hundred titles, he started to devote full time to the business. His books prepared readers for aptitude tests; State, Federal, and local civil service positions; high school admissions; and graduate, professional and business school examinations. He also published model lesson plans and specialty'materials for teachers.
Budman, with the assistance of his wife and half a dozen part-time employees, operated from a Brooklyn loft. His sales rose from $86,543.19 for the whole of 1963 to $105,216.82 for the first six months of 1966, with correspondingly increased profits.
Budman, realizing that his small enterprise reached but a fraction of the potential market, engaged a financial consultant, one Zoes, to advise him how to expand. Preferring merger to alternatives for raising capital, Zoes sought to interest various large publishers, including McG-raw Hill, Crowell-Collier, Holt Beinhardt, and Cowles.
Cowles was a diversified broadcasting and periodical publishing enterprise, then with gross sales of about $135,000,000: It owned Look and Family Circle magazines, television and radio *6 stations, newspapers, and trade papers. Cowles became interested when shown samples of Rudman’s publications and financial statements, and after visiting his plant. Impressed with Rudman’s prolific output of some 600 titles, Maurer, a high Cowles executive, offered for Cowles to purchase the company and employ Rudman.
Maurer and Whitney, an editor of the Cowles educational division, had some reservations: the books, they thought, were not well written, were pegged at too high an intellectual level, and would have to be revised. But these reservations did not discourage them because they attributed existing shortcomings to Rudman’s lack of personnel, market research, and design talent; and, in any event, they wished and were even anxious for Rudman to continue as editor of his publications. They wanted the prolific Rudman to join Cowles as editorial head of a proposed test book division, and concededly told Rudman, at the outset, that he would be a “number one man” in some context.
Two separate agreements, one for acquisition of the company and the other for Rudman’s employment, were executed in June, 1966. Plaintiffs received 9,000 shares of restricted Cowles stock, with a then market value, if unrestricted, of $157,500. Under the plan plaintiffs conveyed the company assets to College Publishing Corporation, a wholly-owned subsidiary of Cowles. By the employment agreement Rudman undertook to perform 11 such executive and administrative services in the educational publishing operations of [Cowles] or its wholly-owned subsidiaries as shall from time to time be reasonably assigned to him by the Company’s Board of Directors and subject to the instructions, direction and control of senior executives of the Company ’ ’. The agreement provided no further detail as to Rudman’s duties. The employment was for five years, subject to renewal at the company’s option, at an annual salary of $30,000 with an increment based on sales. Mrs. Rudman was also to be employed by Cowles.
After the closing, Rudman continued for the summer months in the Brooklyn loft. The new subsidiary, College Publishing, with Rudman as vice-president, was placed under the educational division of Cowles. Maurer was vice-president of the division, *7 Whitney the editor, and one Francine Klagsbrun the managing editor. In July, Maurer directed Budman to clear most matters through Whitney during the summer months. During this period Budman was requested by Whitney to furnish detailed information about his customers, to annotate the source materials for about 200 of his 600 manuals, and, at Budman’s suggestion, to prepare a new publication to be called the College Entrance Examination Series. Budman was to prepare the manuscript in installments, with the last installment due in August, followed by publication in September.
By the end of the summer the scheduling of the College Entrance Series was far behind, and Whitney was not satisfied with the source annotations. This prompted a meeting among Maurer, Whitney and Budman. On September 2 the parties attempted to realign the scheduling and allay the trouble over source materials. No satisfactory conclusion was reached but Maurer and Whitney remained optimistic.
Later that September, revised copy of two old books was forwarded to Budman by Mrs. Klagsbrun, the so-called managing editor of the educational division and actually a young assistant to Whitney, who was supervising revisions. Budman was upset by the magnitude of the revisions and the inclusion of new test questions without his prior approval. When he visited Klagsbrun at the Look offices in Manhattan, he was amazed to see a staff of 20 to 30 people under Klagsbrun working on his books. The offense to him was compounded by discovery that he was not to be listed as author on the cover of the manuals. Budman voiced vehement objections to Whitney that the latter’s staff was tampering with his material.
Concerned with these objections, a meeting was arranged for September 29 among Maurer, "Whitney, Klagsbrun and Budman. Before the meeting, Maurer had an organizational chart drafted which showed College Publishing as a subsidiary under the educational division, and more important, Budman under the supervision of Klagsbrun and Whitney. Budman remonstrated and refused to accept the proposed organizational structure. He said Whitney and Klagsbrun were inferior in rank to him and he would perform his duties only if he did not have to report to Whitney; any other arrangement would be inconsistent with his *8 status as editor and vice-president of College Publishing. Maurer met again the next day with Rudman in a private attempt at reconciliation. Rudman then presented Maurer with his own organizational chart giving him direct access to Maurer in accord with his view of the employment agreement. Maurer told him that it was unacceptable and that Rudman was expected to conform to Maurer’s chart and “ cooperate ” with Whitney and Klagsbrun.
Four days later, October 4, 1966, Rudman wrote Maurer summarizing his position and reasons. He offered reconciliation but asserted that Maurer’s organizational chart was “ irrevocably unacceptable ’ ’. He refused to take directions from Whitney or Klagsbrun, and wanted sole responsibility for the content of his books.
Following these events, Rudman was largely ignored by Cowles, and it was recognized that they might have to discharge him. On October 30 Rudman moved into the Look building in Manhattan. There Rudman had no subordinates, except his wife, no editorial staff to supervise, and his new work and his old books were handled by others over whom he had no control or direction. On his first day in Manhattan he refused to accept a memorandum from Whitney. On December 14 he restated his views in a letter to Maurer. Then, on January 12, 1967, he was discharged.
Within three weeks Rudman set up a new publishing company, National Learning Corporation, with a considerable number of new titles and had initiated arrangements for public financing. As might be anticipated, in its early stages it did not show great return, gross or net. On the other hand, Cowles appears thereafter to have done quite well with the Rudman titles it had taken over. The gross sales figures of the Cowles-produced Rudman books in 1967 and 1968 were respectively $699,400 and $796,000 with ‘ ‘ gross profit ’ ’ of $387,000 and $520,100.
Rudman rests on the agreement that he was employed to perform executive and administrative functions subject only to the supervision of “ senior executives of [Cowles] ” and that Whitney and Klagsbrun were not 11 senior executives ’ ’. Consequently, his refusal to work under either was not insubordination. Moreover, plaintiffs contend there were misrepresentations, *9 established as a matter of law, in the acquisition of the business entitling plaintiffs to rescission.
Following trial the Special Beferee determined that plaintiffs had failed to establish fraud. On the cause of action for wrongful discharge, the Beferee found in favor of Budman. The Appellate Division majority disagreed. It observed that Bud-man had persisted in disobeying the direction of Maurer, his senior executive, to co-operate with his fellow employee, Whitney. Budman’s letter of October 4 was described as “ uncompromising and disputatious in tone ” and placed no duty on Cowles to make further attempts to resolve the difficulties. It concluded that Budman’s attitude and conduct was without justification and constituted insubordination, sufficient to support discharge.
The fraud issue may be disposed of summarily. There is no doubt that a misrepresented intention to perform a contract may constitute actionable fraud (e.g., Adams v. Gillis, 199 N. Y. 314, 319-322; Sabo v. Delman, 3 N Y 2d 155, 160; Restatement, Contracts, § 473). It is not true, however, as argued by plaintiffs that misrepresentations were made out as a matter of law, despite manipulative and ambiguous testimony by defendant’s witnesses of terminology in the prior negotiations that Budman would be the “ number one man ”. Plaintiff’s contention might have been true if Budman’s employment had started when he moved into the Cowles offices in Manhattan, for then it would have been apparent that Cowles, despite what had been said during the negotiations, never intended that he should have executive or administrative responsibilities. In the Manhattan building Budman and his wife were given isolated offices, without staff or significant auxiliary services, were largely ignored, and were generally subordinated inconsistent with the description of Budman’s status in the employment agreement.
But Budman’s employment did not start in Manhattan. It started in Brooklyn and during the first few months it was an open question of fact whether Cowles, after making efforts to perform its part of the agreement, did not then sincerely determine that it had made a mistake, or might have made a mistake, in believing that Budman could fill an executive or administrative position in the Cowles bureaucracy.
*10 Consequently, on the precise fraud issue, namely, whether Cowles ever intended to perform on its representations made during the negotiations, the trial court was entitled to find against plaintiffs despite the ambiguous admissions mentioned earlier. Moreover, fraud must be made out by “ satisfactory ” or 1 ‘ clear and convincing ’ ’ evidence, and it cannot be said that there was similarly impelling evidence in this case (e.g., Adams v. Gillis, 199 N. Y. 314, 323, supra; Manchel v. Kasdan, 286 App. Div. 483, 484, affd. 1 N Y 2d 734; 24 N. Y. Jur., Fraud and Deceit, § 284). The Appellate Division agreed with this finding. As affirmed findings of fact, they are beyond this court’s power to review (Cohen and Karger, Powers, of the 1ST. Y. Court of Appeals, § 109).
On Rudman’s individual cause of action for wrongful discharge, however, the court’s power of review is not similarly limited (id., CPLR 5501, subd. [b]). Reviewing the entire record and applying settled principle Cowles’ discharge of Rudman was actionable.
If an employee, a fortiori an executive employee, is engaged to fill a particular position, any material change in his duties, or significant reduction in rank, may constitute a breach of his employment agreement (Marks v. Cowdin, 226 N. Y. 138, 146-147; Karas v. H. R. Labs., 271 App. Div. 530, affd. 297 N. Y. 494; Hicks v. Haight, 171 Misc. 151; Ann., Demotion or Change of Duties — Breach of Employment Contract, 4 ALR 2d 276). As a necessary corollary, acts done by the employee in defense of his contract rights, or in assertion of an agreed status or function in the enterprise, are not insubordination.
The role permitted Rudman was not that described by Cowles in the negotiations or described in the employment agreement. Rudman’s inevitable expectation was that he would supervise, not without still higher direction, but still supervise, the test book subsidiary, using available auxiliary services with responsibility only to the board of directors of Cowles and their senior executives.
In analyzing the basis for Rudman’s expectation there is no problem dependent on the parol evidence rule. The evidence of the negotiations and such documentation as was received are not inconsistent with, and, hence, do not vary or contradict *11 the written agreement. Moreover, on any view, if it were necessary to reach for that basis, the broad language in the agreement was patently ambiguous in referring, without other specification, to executive and administrative responsibilities. Accordingly, the court may and should look to the prior negotiations to determine what was intended (Rentways, Inc. v. O’Neill Milk & Cream Co., 308 N. Y. 342, 345, 349; Fleischman v. Ferguson, 223 N. Y. 235, 239; Restatement, Contracts, §§ 237, 238, 242 incl. Comment o; Restatement, 2d, Contracts [Tent. Draft No. 6, March 31,1971], § 240 esp. Comment b; 4 Williston, Contracts [3d ed.], § 630).
The Cowles position, during the negotiations, on Rudman’s future role, while obviously not definite in all respects, was definite in describing an executive and supervisory role. This expectation was brought home to Rudman more than once. Rudman was to be head of the test book division, lending assistance to the educational division when called upon by the board. Moreover, it was understandable that, absent express provision or advice to the contrary, an independent entrepreneur like Rudman would not expect and probably would not accept a subordinate scrivener’s role.
Several other circumstances are revelatory of the intention. A press release, dated two weeks before the closing, announced the acquisition and stated, with some qualifications: “ Jack Rudman, founder and President of College Publishing Corp., will serve as editor of the newly-formed subsidiary.” Maurer in pretrial deposition stated that prior to the closing management had concluded that Rudman’s “ role would be as the editor in charge of this the editorial program of this test book operation.” “We felt that, based on his represented strengths as an editor, as a creator of these, that we envisioned that we would want Mr. Rudman to continue in his role as editor of these publications.” “We discussed that he would be editor of what we, for want of a better word, would regard as a test book division.” He also conceded that by editor he meant that Rudman would be “ the number one man ” in the test book division, and that this was implied in discussion with Rudman. The witness later corrected himself to say that he did not think that he had told Rudman he would be “ number one man ” in the test book division but only that he would be “ number one *12 editor ”. Nonetheless, he admitted that he had told Budman he would be in over-all charge of major editorial decisions.
Budman testified that Maurer had told him he was to be the editor of College Publishing. ‘ ‘ I was to be the editor of College Publishing, the test book division. I was to be in charge. I was to supervise and edit and hire and fire personnel such as assistant editors and clerical staff and so on that would be attached to my sector.” Maurer defined “editor” to him as “ the man in charge of the division or section ”; it was the “ title used at Cowles to denote "the executive in charge of the section or operation or business or company.”
Of defendants’ side of the controversy the best that can be said is that a mistake was made, the entrepreneur Budman could not be housebroken to conform to the large multi-million dollar corporate bureaucracy. This is not enough. The written agreement is plain, and the prior negotiations are equally plain and consistent rather than contradictory of the agreement, that Budman was to come on as an executive and administrator and not merely as a writer supervising nobody but himself. He could be discharged for nonperformance or misperformance; he could not be reduced to a rank or responsibility beneath that defined by the agreement and explained by the preagreement negotiations (Marks v. Cowdin, 226 N. Y. 138, 146, supra). Nor could he at the end be put into a state of “ deep-freeze ” until he was provoked into such gross disobedience of “ orders ” that a discharge for insubordination would be plausible.
Besponsibilities assigned Budman during the summer and certainly in the fall months of 1966 were not consonant with executive position. It oversimplifies the issue if it be stated only whether Budman was required to accept direction from or through Whitney without access to Maurer, and that as a consequence he was also “subordinated” to Whitney’s young assistant, Klagsbrun. To be sure, that is part of the issue. But the more embracive issue is whether Budman, in the face of the written agreement and the preagreement negotiations, could be reduced to being only a productive writer who supervised no one and was subject to supervision by just about every other editor and junior executive (Marks v. Cowdin, 226 N. Y., at pp. 146-147, supra). Thus stated, there must be a resolution of the issue in favor of plaintiff Budman.
*13 Turning to a corollary issue, in seeking relief Rudman urges that both agreements constituted a single transaction, the continued performance of one being a condition for the other. Consequently, he and his fellow plaintiffs argue that, as a matter of law, defendants’ breach of the employment agreement mandates that the acquisition be rescinded.
Whether the parties intended to treat both agreements as mutually dependent contracts, the breach of one undoing the obligations under the other, is a question of fact. In determining whether contracts are separable or entire, the primary standard is the intent manifested, viewed in the surrounding circumstances (cf. Ripley v. International Rys. of Cent. Amer., 8 N Y 2d 430,437-438; see 6 Williston, Contracts [3d ed.], § 863). The trial court concluded that each agreement was a “separate and independent transaction.” This resolution appears correct. Although form is not conclusive, that the parties entered into separate written agreements with “ separate assents ” rather than a “single assent” is influential (see Williston, loe. cit., supra; 3A Corbin, Contracts [1960 ed.], § 696, esp. at p. 290, stating that ‘ ‘ when two parties have made two separate contracts it is more likely that promises made in one are not conditional on performances required by the other ’ ’; but compare Bethea v. Investors Loan Corp., 197 A. 2d 448 [Dist. Columbia, Ct. App.]; see, also, HML Gorp. v. General Foods Corp., 365 F. 2d 77, 82 [3d Cir.]). Recognizing that the agreements involved formally different parties, and actually executed on different dates in June, 1966, the conclusion of separateness becomes all but inescapable.
Assuming, however, that mutually dependent contracts were involved, plaintiffs are not entitled as a matter of law to rescission. Such relief, lying in equity, is a matter of discretion (Calhoun v. Millard, 121 N. Y. 69, 77; Ungewitter v. Toch, 31 A D 2d 583, 584, affd. 26 N Y 2d 687; Feldman v. Metropolitan Life Ins. Co., 259 App. Div. 123, 124-125; cf. Doyle v. Allstate Ins. Co., 1N Y 2d 439,443; CPLR 3017). Moreover, the equitable remedy is to be invoked only when there is lacking complete and adequate remedy at law and where the status quo may be substantially restored (6 N. Y. Jur., Cancellation of Instruments, §§ 2-4). Here, damages appear adequate and it is impracticable *14 to restore the status quo, the assimilation of plaintiff’s company being complete (Tarleton Bldg. Corp. v. Spider Staging Sales Co., 26 A D 2d 809; cf. Doyle v. Allstate Ins. Co., supra).
Concluding that there was a wrongful discharge and that rescission is unavailable, there remains the matter of damages. Under the employment agreement, if performed, Rudman would have earned $150,000 as salary which with fringe benefits would aggregate $153,753.99. In the 28-month period following discharge up to the trial he earned $2,100 from his new enterprise, National Learning Corporation. Rudman argues that mitigation is limited to this sum. Instead the trial court assessed his prospects and concluded it would consider the salaries stipulated in the agreement with his new enterprise, namely, $20,000 and $25,000 for each of two successive years. True, the agreement was contingent on prospective public financing. (The contingency has since been realized.) The trial court concluded that Rudman ‘ ‘ will eventually be compensated at the rate of $15,000 yearly, if not more, by the time his employment contract [with Cowles] would have expired ”. It, therefore, deducted by way of mitigation $66,250, leaving a balance from the agreed salary and benefits of $87,503.99 as damages for the wrongful discharge. Prospective as well as actual earnings were properly considered in assessing damages for wrongful discharge (e.g., Hollwedel v. Duffy-Mott Co., 263 N. Y. 95, 101; see 11 Williston, Contracts [3d ed.], § 1361A).
Because the Appellate Division reversed the finding of wrongful discharge, it did not pass on the Rudman and Cowles contentions respecting the mitigation of damages. Involving as it does questions of fact, the case should be remitted to the Appellate Division (CPLR 5613; Cohen and Karger, Powers of the N. Y. Court of Appeals, §§ 138-139, supra). The Appellate Division may, but only if so advised, further remit the issue of damages for a new trial (Cornell v. T.V. Development Corp., 17 N Y 2d 69, 76).
Accordingly, the order of the Appellate Division should be modified, with costs, to reinstate the third cause of action for wrongful discharge and should otherwise be affirmed, and the case remitted to the Appellate Division for further proceedings in accordance with this opinion.
*15 Chief Judge Fuld and Judges Burke, Scileppi, Bergan, Jasen and Gibson concur.
Order modified, with costs, and the case remitted to the Appellate Division for further proceedings in accordance with the opinion herein and, as so modified, affirmed.

 Jack Budman owned 49% of the stock of the acquired company, his wife Frances 50%, and his lawyer Edwin Bernstein 1%. The Johnstone Corporation is the surviving corporation under a changed name.