**CITIES SERVICE COMPANY, Plaintiff,**

**v.**

**GARDINIER, INC., Defendant.**

Superior Court of Delaware,
New Castle.

July 31, 1975.

E. N. Carpenter, of Richards, Layton & Finger, Wilmington, Cleary, Gottlieb, Steen & Hamilton, New York, of counsel, for plaintiff.

Richard F. Corroon, of Potter, Anderson & Corroon, Wilmington, Cravath, Swaine & Moore, New York City, of counsel, for defendant.

## OPINION

WALSH, Judge.

This is an action instituted by plaintiff, Cities Service Company (Cities), seeking $730,160 in damages from defendant, Gardinier, Inc., (Gardinier) for breach of contract. The parties have filed cross-motions for summary judgment.

On January 19, 1973, Cities, Gardinier and Societe des Participations Gardinier, defendant's parent corporation, entered into an agreement providing for the sale to Gardinier of Cities' fertilizer manufacturing and mining operations, known as the "Taco Facilities", for a price of fifty-five million dollars. The agreement also provided for the sale of Taco's supplies, inventories of raw material products, work in process products and finished products existing at the date of settlement, March 23, 1973. The purchase price for the supplies and inventories was additional to the fifty-five million dollars base purchase price and was to be paid in twelve monthly installments commencing 120 days after

settlement. The purchase price for supplies and inventories would be determined by the application of two pricing formulae contained in the agreement, after ascertaining the physical quantities of the materials present at the closing date.

Subsequent to the settlement date, the parties, although having agreed on the quantities of the supplies and inventories physically present, as well as the price for the supplies, were unable to agree on the purchase price for the inventory items. According to Cities' application of the pricing formula a sum of $6,541,086 is due —a figure $730,160 more than the price calculated by defendant under its view of the formula.

Cities sought arbitration in accordance with a provision in the contract.[1] Gardinier, believing that the dispute is not within the purview of the arbitration provision, refused to submit to arbitration and this litigation was commenced.

The parties differ sharply on the meaning of the pricing formula, contained in paragraph 6(e) of the agreement, which provides:

"The purchase price of raw materials products, work-in-process products and finished products shall be (1) the sum of the Direct Costs (as hereinafter defined) for all products (determined for each product by multiplying the Direct Cost per ton of product by the number of tons of product on hand at the Closing Date) plus (2) a fraction of $10,149,000 (being a total of the aggregate overhead cost [$6,468,000] plus the aggregate depreciation [$3,681,000] attributable to the TACO Facilities for 1972), the numerator of which fraction is the amount determined in clause (1) above *and the denominator of which is a figure determined by multiplying the Direct Cost per*

*ton of each product by the number of tons of such product produced during the year 1972, and adding together the results for all products.*" (Emphasis added).

The emphasized portion of the formula represents the method of forming the denominator of a fraction inserted in the pricing formula for the purpose of calculating the indirect costs, *i. e.* overhead and depreciation, of the purchased inventories and allocating a share thereof to each party. According to Cities' calculation, the figure in the denominator is $37,722,073. Gardinier computes the denominator as $119,093,753. Insofar as the parties agree to the figure in the numerator ($3,997,008) the larger the figure in the denominator, the smaller the portion of the indirect costs allocable to Gardinier. Similarly, the smaller the figure in the denominator, the greater the allocation of indirect costs to Gardinier. This difference in the denominator of the fraction fully accounts for the $730,160 in dispute.

Central to the dispute herein is the term "Direct Cost" which is used throughout the formula, including the portion relative to the denomination of the fraction. A definition of "Direct Cost" contained in the agreement itself provides in pertinent part:

"The term 'Direct Cost' as used in this paragraph (e) shall mean the Direct Cost per ton of product determined by taking the 'raw costs' per ton of products as of the end of the month preceding the Closing Date from the books and records of Cities Service in the same manner using the same procedure as the 'raw costs' per ton of such products at November 26, 1972, as shown on Exhibit Q hereto, were determined . . ."

Although no problem has arisen with respect to the application of the term "Direct

---

1. That provision reads: "If for any reason the representatives of Cities Service and the Subsidiary [Gardinier, Inc.] fail to agree upon anything which requires their mutual agreement under this paragraph (e), they shall submit their differences to Peat, Marwick, Mitchell & Co. and shall abide by the decision rendered by said firm."

Cost" in other portions of the formula, the parties' calculations of the "Direct Cost" of products produced in 1972, an element of the denominator of the fraction, differ significantly.

For each inventory item produced in 1972, as delineated in Exhibit Q,[2] Gardinier has adopted, as the "Direct Cost" per ton, the precise figure entered in Cities' books and records as the "Raw Cost" of the item, as of the end of the month preceding the closing. Those figures constitute an update of the "Raw Cost" figures listed for each item of inventory in Exhibit Q.[3]

Cities, on the other hand, adopted, as the "Direct Cost" of each item of inventory, the so-called "Incremental Raw Cost" thereof, as of the end of the month preceding the closing. According to Cities, many of the products listed in Exhibit Q are further refined into other products contained on that list and the precise "Raw Cost" figures found in Exhibit Q, as well as in Cities' books and records, include the cost of producing components as well.[4] Therefore, in Cities' view, the true "Raw Cost" figures are not the cumulative "Raw Cost" figures, such as are listed under the column entitled "Raw Cost" in Exhibit Q, which, if used in the denominator of the fraction would, in some cases, duplicate, triplicate or quadruplicate costs, but rather the incremental "Raw Cost" figures, which are readily ascertainable by deducting from the cumulative "Raw Cost" figure the "Raw Cost" of all components of a product.[5]

In support of its motion for summary judgment Gardinier contends that the term "Direct Cost" is unambiguously defined in the agreement and a strict application of the formula supports Gardinier's calculation of the denominator figure. It asserts that there is no justification for Cities' utilization of "Incremental Raw Costs" since that term appears neither in the agreement nor in Exhibit Q. Gardinier argues that contract law requires that the agreement be enforced in accordance with the intention of the parties, as expressed in the language of the contract. It is immaterial, according to Gardinier, that the application of the formula it advances leads to an inequitable allocation of indirect costs, with little rational basis, because the formula was agreed to by Cities with full knowledge of its consequences, after considerable negotiations during which concessions were made by both parties. Furthermore, it argues, parol or extrinsic evidence offered by Cities in an attempt to demonstrate

2. Exhibit Q referred to in the definition of Direct Cost is a list of 15 products listed on a comparison basis for the 11 months of 1972. The following three items appear on the exhibit and illustrate its significance:

| | Unit of Quantity | Actual—YTD November 1972 | | | Total Cost |
| --- | --- | --- | --- | --- | --- |
| | | Quantity | Raw Cost | Overhead | |
| Wet Phosphate Rock | Tons | 1,285,029 | 2.54 | 0.53 | 3.07 |
| Dry Phosphate Rock | Tons | 1,364,279 | 2.83 | 0.53 | 3.36 |
| Anhydrous Ammonia | Tons | 116,410 | 33.17 | 3.48 | 36.65 |

3. A good example is the item "Dry Phosphate Rock". The Raw Cost figure listed in Exhibit Q is 2.83 per ton. The Raw Cost figure in Cities' books and records as of the end of the month before the closing is 3.59 per ton. Insofar as the agreement stipulated that the "Direct Cost" of a product would be the equivalent of the "Raw Cost" appearing in Cities' books and records at the end of the month preceding the closing date, Gardinier would compute the "Direct Cost" of "Dry Phosphate Rock" as 3.59 per ton.

4. For example, the "Raw Cost" of producing Dry Phosphate Rock, which is listed in Exhibit Q as 2.83 per ton includes the 2.54 per ton "Raw Cost" of producing a ton of Wet Phosphate Rock which is then dried and becomes Dry Phosphate Rock.

5. Using the same example, the "Incremental Raw Cost" of Dry Phosphate Rock, as calculated from the figures listed under the Raw Cost column in Exhibit Q would be $.29 per ton. ($2.83–$2.54).

what the parties intended should not be allowed to modify the terms of a detailed integrated agreement.

Cities, in opposition to Gardinier's motion for summary judgment, argues that the formula provision relative to the denominator is sufficiently ambiguous, when read in context, to entitle it to demonstrate by extrinsic evidence that the parties intended to allocate indirect costs in a rational and equitable manner and, *a fortiori,* intended computation of the denominator in the manner expressed by Cities. In support of its cross-motion for summary judgment, Cities contends that only its method of calculation leads to a rational result since Gardinier's interpretation tends to multiply costs of certain products as much as five times. Contract law requires, Cities asserts, that a provision be interpreted in such a manner as to render a fair and reasonable meaning, not an arbitrary and capricious result.

■ The parties have provided in the agreement that performance thereunder is governed by the laws of New York, and, the Court shall thus look to the contract law of that State for guidance in ruling on these motions.[6]

■ In interpreting a commercial document, the cardinal principle is to ascertain the intent of the parties and avoid an over-technical approach. *Deering Milliken, Inc. v. Georgette Juniors, Inc.,* 17 A. D.2d 405, 235 N.Y.S.2d 72 (1962). If the intent of the parties is fully expressed and embodied in an unambiguous contract, determined to be such as a matter of law, evidence of the intentions and acts of the parties plays no part in the interpretation of the language. *Harnett Co. v. New York State Thruway Auth.,* 3 Misc.2d 257, 155 N.Y.S.2d 100 (1956); *Levco Construction Corp. v. State,* 43 A.D.2d 759, 350 N. Y.S.2d 219 (1973). Where, however, the language employed is not free from ambi-

guity or where it is equivocal and its interpretation depends upon the sense in which the words were used and the setting of the contract, the intent of the parties becomes a matter of inquiry. *Shapiro v. Aetna Ins. Co.,* Sup., 26 Misc.2d 820, 208 N.Y.S.2d 83 (1960); *Fellenz v. Schafer,* Sup., 229 N. Y.S.2d 144 (1962). See also *Bird v. Computer Technology Inc.,* S.D.N.Y., 364 F.Supp. 1336 (1973); *Rudman v. Cowles Communication, Inc.,* 30 N.Y.2d 1, 330 N. Y.S.2d 33, 280 N.E.2d 867 (1972).

■ It is fundamental that the parol evidence rule is not violated when extrinsic evidence is admitted for the purpose of aiding the Court in its interpretation of an ambiguous written instrument. *Williston on Contracts,* Vol. 4, § 632. The parol evidence rule is a rule of substantive law not related to interpretation or the admission of evidence for the purpose of interpretation, and extrinsic evidence cannot be said to vary or contradict a writing until, by process of interpretation, it is determined what the writing means. *Atlantic Northern Airlines v. Schwimmer,* 12 N.J. 293, 96 A.2d 652 (1953). As long as the court is aware that doubts and uncertainty lurk in the meaning and application of agreed language, it welcomes testimony pertaining to antecedent agreements, communications and other factors which bear upon the issue. *Corbin on Contracts,* Vol. 3, § 579. Moreover, even where a term is defined in a contract, the definition may, itself, be so worded as to require extrinsic evidence to determine its meaning and application. *Magnaflux Corp. v. Foerster,* N.D.Ill., 223 F.Supp. 552 (1963); *Corbin on Contracts,* Vol. 3, § 579 (Supp.1971).

■ Mindful of these principles, the Court concludes that sufficient ambiguity exists concerning the term "Direct Cost" as it appears in the portion of the formula determining the figure in the denominator, to warrant the introduction of extrinsic ev-

6. Delaware law mirrors New York law in this respect thus its application does no violence to attitudinal law of the forum.

idence relative to the intentions and understanding of the parties at the time the formula was drafted. The definition of "Direct Cost" in the agreement, incorporating Exhibit Q as a reference for determining the "Raw Cost" of a product, is not so clear and unambiguous that a party could not believe that "Incremental Cost" was intended. Although the term "Incremental Cost" does not appear in Exhibit Q, such costs are readily ascertainable by reference to Exhibit Q followed by simple mathematical computation. Indeed, if the parties had intended that "Incremental Raw Costs" were appropriate in the denominator calculation, the definition of "Direct Cost", albeit imprecise, is sufficiently broad to achieve that result. The fact that a term appearing throughout a formula can be considered ambiguous in only one portion thereof is readily explainable. Elsewhere in the formula, the term is used in conjunction with products that were physically present at the time of the closing and which Gardinier would obtain upon conveyance. The possibility of multiplying the cost of a product a number of times could not exist. However, as used in the denominator, the term "Direct Cost" refers to products produced in 1972, some of which had been further processed and refined into other products. Thus the possibility that a product's costs would be duplicated or triplicated arose, resulting in an ambiguity not apparent in other portions of the formula.

■ Evidence exists on the record, in the affidavit of John H. Campbell, Division Controller, Chemicals and Metals, Cities Service Company, which suggests that Gardinier's representatives, at the time the formula was conceived, were cognizant of the fact, as Campbell claims he was, that incremental costs would have to be used in determining the cost of products produced in 1972, in order to avoid multiplication. This raises a factual issue which, in conjunction with the ambiguity in the portion of the formula concerning the denominator of the fraction inserted for the purpose of allocating indirect costs makes a summary disposition of this litigation, in favor of either party, inappropriate.[7]

■ Cities' argument that it is entitled to attorney's fees due to Gardinier's failure to comply with the arbitration provision in the contract is unpersuasive. The authority upon which it relies is distinguishable. In *Magoun v. Magoun*, 84 App.Div. 232, 82 N.Y.S. 820 (1903), a party had agreed to submit an existing dispute to arbitration and subsequently revoked the submission, thereby damaging the other party who had incurred expenses in preparing for the arbitration proceeding. Such circumstances are not here present. The Court does not comprehend how Cities, who has pursued its claim in this forum as an alternative to arbitration has, at this time, suffered any damage by Gardinier's refusal to arbitrate.

For the reasons discussed, Gardinier's motion for summary judgment, Cities' motion for summary judgment and Cities' motion for an award of attorney fees due to Gardinier's refusal to comply with a contractual arbitration provision are denied.

It is so ordered.

7. Although plaintiff's interpretation is, even by defendant's admission, the more reasonable among the two possible interpretations arising out of the ambiguity; extrinsic evidence may, in fact, demonstrate that plaintiff agreed to the method of calculating the denominator advanced by defendant, as a relatively small concession considering the entire contract price in the negotiation state. Summary judgment for plaintiff is, therefore, unwarranted.