[996 NYS2d 516]

Astoria Equities 2000 LLC, Plaintiff, v Halletts A Development Company, LLC, et al., Defendants.

Supreme Court, Queens County, November 25, 2014

**APPEARANCES OF COUNSEL**

*Meister Seelig & Fein LLP*, New York City (*Stephen B. Meister* of counsel), and *Jaspan Schlesinger LLP*, Garden City (*Jeffrey D. Lebowitz* of counsel), for Halletts A Development Company, LLC and others, defendants.

*Rosenberg & Estis, P.C.*, New York City (*Michael A. Pensabene* of counsel), for Halletts Vendee, LLC and another, defendants.

*Stern Tannenbaum & Bell LLP*, New York City (*David S. Tannenbaum* of counsel), and *Morton Povman, P.C.*, Forest Hills (*Morton Povman* of counsel), for plaintiff.

**OPINION OF THE COURT**

Martin E. Ritholtz, J.

Defendant Halletts A Development Company, LLC (the defendant company) has moved for, inter alia, an order pursuant to CPLR 7503 compelling plaintiff Astoria Equities 2000 LLC to arbitrate a dispute concerning a written agreement dated June 26, 2007.

I. The Facts and Allegations

This case concerns a parcel of realty owned by plaintiff Astoria Equities 2000 LLC, which, according to Alexander Durst, the co-vice-president of SRDA Manager, LLC (the managing member of Durst Manager, LLC),

> "is a central and indispensable parcel to Durst's
> [Durst entities'] immensely complex, large scale

> $1.5 billion community development project . . .
> that is set to develop an underutilized and dilapi-
> dated waterfront area of Astoria, New York known
> as 'Hallet's Point,' transforming the area into a
> revitalized community of affordable and market
> rate housing."

Plaintiff Astoria seeks in this case, inter alia, a judgment that it need not deliver a deed to its property to the Durst entities.

As reported by the New York Times in an article written by Charles V. Bagli datelined September, 26, 2014,

> "the Durst family, whose empire was built on a for-
> est of Manhattan office towers, is plunging into the
> housing market with an ambitious plan for a
> sprawling residential development on the Queens
> waterfront.
>
> "The Dursts . . . are now looking to spend $1.5 bil-
> lion to transform a knobby, windswept peninsula in
> Astoria . . . .
>
> "Plans call for a set of seven apartment buildings
> with more than 2,000 apartments—20 percent
> reserved for poor and working-class tenants—an
> esplanade, a school and a supermarket where
> industrial buildings now stand." (Charles V. Bagli,
> *Builders Turn Focus to Housing Market*, NY Times,
> Sept. 26, 2014).

According to Alexander Durst,

> "Durst purchased the Properties and it will *build*
> on them as part of a larger, long-term, complex
> development in a re-zoned Hallets Point, which will
> include 2.5 million square feet of residential and
> retail use in *eight buildings*, along with public
> parks, an esplanade, and other public and private
> amenities. . . .
>
> "In fact, Durst has already begun the construction
> process, including creating and gaining approval
> for a construction plan, commencing design develop-
> ment of the first building to be built on the Astoria
> Equities property, and obtaining City-approved
> phasing of the Development Project. . . . Durst's
> current construction schedule provides for begin-
> ning physical work within approximately *30 days*."

Alexander Durst, stressing the need for a speedy resolution of the dispute with plaintiff Astoria, further alleges the following: The project required the approval of the New York City

Housing Authority, the Department of Housing and Urban Development, the New York City Parks Department, the New York State Office of General Services, and the New York City Department of Transportation. Durst's development plan was subject to the New York City Uniform Land Review Procedure (ULURP), and the ULURP approved plan requires that each building that Durst constructs at Hallets Point "be built in sequence, one at a time, to ensure that the area is able to sustain the appropriate level of construction activity." Moreover, "the City-approved Development Project phasing requires that the first building to be built is on the Property site that Astoria Equities now refuses to convey to Durst pursuant to the Agreement." Plaintiff Astoria's refusal to convey its property "necessarily halts the entire $1.5 billion Development Project."

Pursuant to a written contract dated June 26, 2007 entered into by plaintiff Astoria Equities 2000 LLC (Astoria) and Hallets Point Developers, LLC (HPD), the former agreed to sell to the latter premises known as 1-02 26th Avenue, Astoria, New York. Plaintiff Astoria alleges that the consideration it received had two components: (1) $7,500,000 in cash and (2) an equity interest, now worth approximately 8.4% of the defendant company, in the entity that would acquire the properties for future development. Plaintiff Astoria further alleges that it agreed to accept substantially less than fair market value in cash for its property in consideration for the equity interest in the project. The parties amended their contract by letter agreement dated August 15, 2008.

Pursuant to said letter agreement dated August 15, 2008, plaintiff Astoria consented to an assignment of the purchaser's interest in the contract to "Hallets A. Hallets Point Development Company, [sic]" or other entity described in the letter agreement.

The letter agreement further provided:

"Any dispute arising out of or in connection with this Letter Agreement or the Agreement [dated June 26, 2007] shall be settled through arbitration by a sole arbitrator to be agreed between the parties, or failing agreement within five (5) days . . . by an arbitrator to be appointed by the Supreme Court of New York."

By written assignment of purchase and sale agreement dated August 15, 2008, HPD assigned its rights under the contract

dated June 26, 2007 to the defendant company. The third amendment to purchase and sale agreement dated July 2012 changed the "Outside Closing Date" to September 15, 2014.

Plaintiff Astoria is a non-controlling minority member of the defendant company. According to Isaac Deutsch, plaintiff Astoria's managing member, the relations between the members of the defendant company are governed by the "Halletts A Operating Agreement" (the operating agreement), also dated August 15, 2008, which in his words, granted the plaintiff a "significant equity interest in the entire project" and "the right to bid to purchase other parcels of the Project or the entire project before any piece of it could be sold to third parties."

In September 2010, the parties executed a "Memorandum of Purchase and Sale Agreement," which contained, inter alia, an acknowledgment by plaintiff Astoria that "Purchaser has made total payments to Seller on account of the purchase price for the Property in the amount of $4,125,000."

The defendant company also holds an interest in contracts to purchase two other parcels of realty adjacent to or nearby the property owned by plaintiff Astoria, and these three properties comprise a waterfront area in Astoria known as "Hallets Point." The defendant company also sought to acquire nearby parcels of realty owned by the New York City Housing Authority (NYCHA). It appears that the defendant company was formed for the purpose of having the properties rezoned and resold.

Pursuant to a contract dated April 14, 2014 (the Durst agreement or Halletts Vendee agreement) between the defendant company and Halletts Vendee LLC (a Durst company), the former agreed to sell its rights to the three parcels of realty in Halletts Point and its right to the NYCHA properties to the latter.

According to Deutsch,

> "Despite Astoria Equities' valuable rights under the Operating Agreement, . . . [the defendant company], led by Joel Bergstein . . . . and David Weinstein . . . purported to enter into the Halletts Vendee Agreement, dated April 14, 2014 . . . with the newly created 'Durst Entities,' i.e., defendants Hallet[t]s Vendee LLC . . . and/or Hallet[t]s Astoria L[L]C (together the 'Durst Defendants'), to sell the entire Project to the Durst Defendants, retain a still unknown portion of the Project for themselves, *and unlawfully wipe out Astoria Equities' entire*

*interest in the proceeds of the Project."*

The defendants allege that in or about June and July 2014, the plaintiff expressed to LEG Astoria, LLC, the managing member of the defendant company, its dissatisfaction with the terms of the Durst agreement and made a demand for more money. Thereafter, the plaintiff began the instant action. By letter dated August 7, 2014 sent to the plaintiff, the defendant company adjourned the closing under the agreement between the parties and directed the plaintiff to deliver the deed to Halletts Astoria LLC, as grantee, after the sale.

The defendant company thereafter served the plaintiff with a notice dated August 28, 2014 demanding that the parties arbitrate their dispute pursuant to the terms of the letter agreement. The plaintiff replied that the arbitration demand was defective because it was not served in accordance with CPLR 7503 (c).

By letter dated September 4, 2014, the plaintiff confirmed that it would not proceed with a closing scheduled for that day.

II. Procedural History

Plaintiff Astoria began this action by the filing of a summons with notice on or about July 25, 2014, and later filed a complaint on or about October 1, 2014.

The complaint contains 27 causes of action, the first seven of which seek a declaratory judgment that the agreement to sell the defendant company's interest in the project to Halletts Vendee LLC is null and void because it was entered into in breach of the defendant company's operating agreement.

The eighth cause of action seeks a permanent injunction prohibiting the defendants from closing under the Halletts Vendee agreement. The twenty-fifth cause of action seeks a declaratory judgment that plaintiff Astoria is not required to deliver a deed to the property unless the defendant company has complied with the operating agreement and letter agreement. The twenty-sixth cause of action seeks a declaratory judgment that plaintiff Astoria was not required to close on its contract of sale with the defendant company on September 4, 2014. The twenty-seventh cause of action seeks a declaratory judgment that plaintiff Astoria has the right to postpone the closing of its contract of sale with the defendant company up to 180 days to pursue a like-kind exchange.

On September 9, 2014, the defendant company attempted to begin a special proceeding in the New York State Supreme

Court, County of Queens for the purpose of compelling arbitration (*Matter of Hallets A. Dev. Co., LLC [Astoria Equities 2000, LLC]*, index No. 706385/14). However, the Honorable Duane Hart refused to sign the order to show cause initiating the special proceeding because the papers were not adequate. The court noted: "The movant's papers are somewhat short of facts whereby this court could grant this application."

Pursuant to a so-ordered handwritten stipulation dated October 31, 2014, the parties agreed that "[t]he 26th & 27th causes of action of the complaint shall be severed and submitted to arbitration before JAMS." Pursuant to a so-ordered typewritten stipulation dated November 5, 2014, the parties further agreed that "the 26th and 27th causes of action in the Complaint, and any other causes of action the Court decides to refer to arbitration, shall be arbitrated before Hon. Bernard J. Fried (Ret.) of the Judicial Arbitration and Mediation Services ('JAMS') as sole arbitrator."

## III. Discussion

### A. Arbitration

Plaintiff Astoria's objection to the manner that the defendant company served its notice to arbitrate has no merit. The defendant company served its arbitration demand pursuant to and in compliance with paragraph 18 of the agreement (dated June 26, 2007), as alleged by Stephen Meister, Esq., and paragraph 10 of the letter agreement. Where, as here, parties agree to the manner in which a demand for arbitration can be served, they do not have to comply with the service requirements established by CPLR 7503 (c). (*Matter of Severin [County of Broome]*, 89 AD2d 689 [1982].)

Contrary to the argument made by plaintiff Astoria, Judge Hart's refusal to sign the order to show cause brought in *Matter of Hallets A. Dev. Co., LLC (Astoria Equities 2000, LLC)* (index No. 706385/14) has no collateral estoppel effect in this action. The doctrine of collateral estoppel will only be applied to matters "actually litigated and determined" in a prior action. (*Kaufman v Eli Lilly & Co.*, 65 NY2d 449, 456 [1985]; *M.V.B. Collision, Inc. v Rovt*, 101 AD3d 830 [2012].) The refusal to sign an order to show cause because of sketchy papers did not amount to the actual litigation and determination of the defendant company's right to compel arbitration. Moreover, the defendant company abandoned the prior special proceeding and is not now bringing a motion to renew before a different judge.

The court gleans from the defendants' papers that they are seeking to compel arbitration of the eighth, twenty-fifth, twenty-sixth and twenty-seventh causes of action only. The defendants assert that while claims seeking money damages for alleged breaches of the defendant company's operating agreement are "plaintiff's only real gripe—and drive 23 of the 27 causes of action in the complaint," the eighth, twenty-fifth, twenty-sixth, and twenty-seventh causes of action seek declaratory relief from this court that it is not required to close or deliver a deed under the contract of sale. "Such relief," the defendants assert, is for the arbitrator to determine. Moreover, on the instant motion, the defendants seek to toll their time to answer the complaint only in regard to the eighth, twenty-fifth, twenty-sixth, and twenty-seventh causes of action.

The stipulations entered into by the parties sending the twenty-sixth and twenty-seventh causes of action to the arbitrator do not resolve the central issue in this case. The twenty-sixth cause of action merely concerns plaintiff Astoria's obligation to close on a particular day selected by the defendant company, and the twenty-seventh cause of action merely concerns plaintiff Astoria's right to postpone the closing for the purpose of implementing a like-kind exchange.

CPLR 7503, "Application to compel or stay arbitration; stay of action; notice of intention to arbitrate," provides in relevant part:

> "(a) Application to compel arbitration; stay of action. A party aggrieved by the failure of another to arbitrate may apply for an order compelling arbitration. Where there is no substantial question whether a valid agreement was made or complied with, and the claim sought to be arbitrated is not barred by limitation under subdivision (b) of section 7502, the court shall direct the parties to arbitrate." (*See Isaacs v Prospect Park, LLC*, 95 AD3d 1176 [2012]; *Matter of Lory Fabrics [Dress Rehearsal, Inc.]*, 78 AD2d 262 [1980]; *Marben Realty Co. v Sweeney*, 87 AD2d 561 [1982].)

> "It is of course for the court in the first instance to determine whether parties have agreed to submit their disputes to arbitration and, if so, whether the disputes generally come within the scope of their arbitration agreement. The court's inquiry ends, however, where the requisite relationship is established between the subject matter of the dispute

and the subject matter of the underlying agreement to arbitrate." (*Sisters of St. John the Baptist, Providence Rest Convent v Geraghty Constructor*, 67 NY2d 997, 998 [1986].)

A party cannot be directed to submit to arbitration unless the agreement to arbitrate expressly and unequivocally encompasses the subject matter of the particular dispute. (*Bowmer v Bowmer*, 50 NY2d 288 [1980]; *Matter of American Centennial Ins. Co. v Williams*, 233 AD2d 320 [1996].) The burden of proof is on the party demanding arbitration. (*Matter of American Centennial Ins. Co. v Williams*.)

In determining whether the dispute between plaintiff Astoria and the defendant company is arbitrable, the court will first turn to the complaint. Although the complaint is 50 pages long and contains 27 causes of action, the plaintiff's attorney has succinctly described its basis:

"The gravamen of the Complaint is that Lincoln, as manager, and the Company, aided and abetted by the other defendants, breached Article 2 of the Operating Agreement by entering into the Halletts Vendee Agreement because: (1) the Company purported to agree therein to convey the Purchase Agreements and/or title to the Properties to the Durst Defendants, even though the conveyance does *not* serve any purpose beneficial to the Company or Astoria Equities; (2) the agreement would substitute in defendants Halletts Vendee and/or Halletts Astoria as the Development Company in place of the Company *without the Company acquiring any interest in the Proposed Acquiring Defendants*, thereby neither protecting or preserving Astoria Equities' interest in the Properties; (3) the agreement would wrongfully deprive Astoria Equities of its right to have its interests in and to the Property remain 'substantially similar to those in effect' as of the date of [the] Operating Agreement; and (4) the agreement would result in a diminution of profits to be realized by Astoria Equities as compared to a development in which the Company retained the Property and Purchase Agreements itself." (Plaintiff's mem of law at 7-8.)

Despite alleging in the complaint that it has a right to rescind the letter agreement because of the defendant company's breaches of the operating agreement, plaintiff Astoria argues on this motion that there are "two separate and distinct agree-

ments" that control the relationship between itself and the defendant company—the letter agreement and the operating agreement. The plaintiff argues that the defendant company must comply with both of these agreements before the plaintiff becomes obligated to transfer the property. The plaintiff then relies on section 10.3 of the operating agreement which provides that claims arising thereunder must be brought in federal or state courts located in New York.

In the opinion of the court, both sides have an interest in presenting the sale agreement and the operating agreement as two separate and distinct contracts—the plaintiff to avoid the effect of the arbitration clause found in the letter agreement alone on its entire case, and the defendant to avoid the absence of an arbitration clause in the operating agreement. The parties have undeniably based their arguments on the premise of two separate contracts. The plaintiff's attorney asserts: "The critical point to understand here is that there are two separate and distinct agreements that control the relationship between Astoria Equities and the Company—the Operating Agreement and the parties' Purchase and Sale Agreement dated June 26, 2007 . . . ." (Plaintiff's mem of law at 2.) The defendants' attorney asserts:

> "While it is true . . . that the Halletts A Operating Agreement does not contain an arbitration clause, that does not mean that by alleging that *that agreement* was violated plaintiff can escape the arbitration clause in the Letter Agreement when it comes to Plaintiff's obligations under the Agreement and the enforceability of the Agreement." (Defendants' mem of law at 12.)

However, the court is of the view that the letter agreement and the operating agreement may be treated as one instrument. The letter agreement containing the arbitration clause and the operating agreement are both dated August 15, 2008. Both documents govern, inter alia, the business relationship between the parties, and the letter agreement notes that "[c]ontemporaneously herewith Astoria Equities has become a member of Halletts A pursuant to that certain Operating Agreement dated of even date herewith . . . ." "Generally, the rule is that separate contracts relating to the same subject matter and executed simultaneously by the same parties may be construed as one agreement . . . ." (*Williams v Mobil Oil Corp.*, 83 AD2d 434, 439 [1981]; *see Commander Oil Corp. v Advance Food Serv. Equip.*, 991 F2d 49 [1993].)

"In the absence of anything to indicate a contrary intention, instruments executed at the same time, by the same parties, for the same purpose, and in the course of the same transaction will be read and interpreted together, it being said that they are, in the eye of the law, one instrument. . . .

"The issue whether separate documents executed simultaneously should be treated as a single contract is governed by the intent of the parties manifested at the time of contracting and viewed in the light of all the surrounding circumstances." (22 NY Jur 2d, Contracts § 255.)

If, as the plaintiff contends, the operating agreement sets out part of the consideration to be paid for the sale of its property, then the sale agreement and the operating agreement certainly relate to the same subject matter, and the court finds an intent that the two documents should be treated as a single contract.

The plaintiff's attorney asserts:

"Astoria Equities agreed to sell the Astoria Equities Property to the Company for two components of consideration: (1) $7.5 million in cash, and (2) *as set forth under the Operating Agreement*, an equity interest valued at $7.5 million, now worth approximately 8.4% of the Company in the entity that would acquire the Properties for future development." (Mem of law at 5 [emphasis added].)

After taking the position that part of the consideration for the sale of the property is specified in the operating agreement, the plaintiff cannot successfully deny that the letter agreement and operating agreement should be treated as one instrument.

The plaintiff faced a dilemma. In order to avoid arbitration, it must treat the letter agreement and the operating agreement as separable contracts. In order to rescind the letter agreement, the plaintiff must treat it and the operating agreement as mutually dependent contracts, "the breach of one undoing the obligations under the other." (*Rudman v Cowles Communications*, 30 NY2d 1, 13 [1972]; *National Union Fire Ins. Co. of Pittsburgh, Pa. v Christopher Assoc.*, 257 AD2d 1 [1999].) The plaintiff did not escape this dilemma.

In the case at bar, the arbitration clause entered into by the parties is very broad: "*Any* dispute arising out of *or in connection* with this Letter Agreement or the Agreement [dated June 26, 2007] shall be settled through arbitration . . . ." (Emphasis added.) The dispute concerning the defendant company's

compliance with the operating agreement is certainly connected to the letter agreement, the two contracts being treatable as one instrument or as mutually dependent contracts, "the breach of one undoing the obligations under the other." (*Rudman v Cowles Communications* at 13.) Any grounds based in the operating agreement which plaintiff Astoria purportedly has for refusing to comply with the letter agreement are certainly linked or related to the letter agreement.

A dispute over the consideration to be received by the plaintiff for the sale of its property, although the consideration be partly expressed in the operating agreement, goes to the heart of the sale agreement itself, and, thus, the court finds that there was a clear intent to arbitrate as expressed in the broad arbitration clause and as required by the law of this state. (*See Matter of Marlene Indus. Corp. [Carnac Textiles]*, 45 NY2d 327 [1978]; *Vitals986, Inc. v Healthwave, Inc.*, 15 AD3d 571 [2005]; *Matter of Morris v Signorelli*, 9 AD3d 433 [2004], *lv denied* 3 NY3d 610 [2004]; *RAD Ventures Corp. v Gotthilf*, 6 AD3d 415 [2004].)

Accordingly, that branch of the motion by the defendant company which is for an order compelling arbitration of the eighth, twenty-fifth, twenty-sixth, and twenty-seventh causes of action is granted. As noted above, the twenty-sixth and twenty-seventh causes of action have already been sent to arbitration before Hon. Bernard J. Fried (retired) at JAMS. In accordance with the so-ordered stipulation of the parties, dated November 5, 2014, the eighth and twenty-fifth causes of action are also hereby referred to Hon. Bernard J. Fried for immediate arbitration.

B. The Preliminary Injunction

A court may issue a preliminary injunction in connection with an arbitration proceeding "only upon the ground that the award to which the applicant may be entitled may be rendered ineffectual without such provisional relief." (CPLR 7502 [c]; *see Matter of Ottimo v Weatherly Sec. Corp.*, 306 AD2d 287 [2003].) The party seeking the preliminary injunction must also make the tripartite showing required under CPLR article 63. (*Matter of Ottimo v Weatherly Sec. Corp.*) The defendant seeks a preliminary injunction essentially prohibiting the plaintiff from transferring the property to a third party. Pursuant to so-ordered stipulations dated October 14, 2014 and October 31, 2014, the plaintiff agreed not to convey any interest in the property except for the purpose of refinancing as provided therein, pending the determination of the instant motion.

The defendant company has made an adequate showing that it is entitled to a preliminary injunction in aid of arbitration. Accordingly, that branch of the motion by the defendant company which is for a preliminary injunction is granted to the extent that the plaintiff is hereby enjoined from conveying any interest in the subject real property, except for the purpose of refinancing its existing mortgage, as provided in the so-ordered stipulation of October 14, 2014, pending the determination of the arbitration ordered herein. The parties may submit affidavits concerning the proper amount of the undertaking at the time of the settlement of the order to be entered hereon.

C. The Stay

The defendant company seeks a stay of its obligation to answer the eighth, twenty-fifth, twenty-sixth, and twenty-seventh causes of action. The defendant company is entitled to such relief (*see* CPLR 7503 [a]).

Accordingly, that branch of the motion by the defendant company which is for a stay is granted.