NEDERLANDSE DRAADINDUSTRIE
NDI B.V., Plaintiff,

v.

GRAND PRE–STRESSED
CORPORATION,
Defendant.

No. 76–C–1309.

United States District Court,
E. D. New York.

March 5, 1979.

Greenbaum, Wolff & Ernst, New York City, for plaintiff; James M. Brachman, New York City, of counsel.

Allen I. Sak, Deer Park, N. Y., for defendant.

BARTELS, District Judge.

Plaintiff, Nederlandse Draadindustrie NDI B.V. ("NDI"), is a Dutch manufacturer of steel strand ("strand"), and defendant, Grand Pre-Stressed Corporation ("Grand"), is a domestic manufacturer of pre-stressed concrete, of which strand is a component. In this diversity action, plaintiff seeks damages in the amount of $263,069.51 together with interest and costs for breach of a contract for the sale of approximately 1180

metric tons of steel strand to defendant. The sum claimed represents deficiencies allegedly due both for strand (a) delivered by plaintiff and accepted by defendant and (b) contracted for but which was rejected by defendant and was either sold to third parties or not produced at all. Defendant denies liability under either claim and asserts a counterclaim in the amount of $1,275.[1] The case was tried without a jury, two witnesses being called by plaintiff and none by defendant. After considering the testimony and numerous exhibits, the Court has reached the conclusions set forth in the following opinion which constitutes its findings of fact and conclusions of law.

## I. FACTS

### The Contract

On May 2, 1975, the parties executed a written agreement for the sale of 5,000,000 linear feet (U.S.) of one-half inch steel strand, amounting to approximately 1180 metric tons, at a cost to defendant of $159 per thousand feet, C.I.F. New York, excluding duty, and to be furnished by plaintiff according to the following schedule over a seven-month period:

¶ 3(e)   Schedule of Arrival 1975

| | | |
|---|---|---|
| June | 400,000 feet, about | 94.4 tons |
| July | 400,000 feet, about | 94.4 tons |
| August | 600,000 feet, about | 141.6 tons |
| October | 1,000,000 feet, about | 236 tons |
| November | 1,000,000 feet, about | 236 tons |
| December | 1,000,000 feet, about | 236 tons[2] |

As stated in the preamble to the agreement, defendant was intending to use the strand as a component of pre-stressed concrete piles required for the construction of a sew-

---

1. Defendant's first and second counterclaims were stricken by order of the Court prior to trial.

2. The shipment intended for the month of September was inadvertently omitted from the delivery schedule in paragraph 3(e) of the agreement entered into on May 2, 1975. On June 5, defendant's Vice President, Walter Conlon, confirmed by mailgram the parties' "original intent" by specifying that the consignment for September should be 6,000 [sic—600,000] line-

ar feet. By return cable plaintiff confirmed the correct figure of 600,000 linear feet for delivery in September.

The schedule was revised further by agreement of the parties when, on June 19, 1975, Conlon again wrote plaintiff requesting that the August and September footage be increased to 1,000,000 each and the October, November, and December footage be reduced to 900,000, 700,-000, and 600,000 respectively. Plaintiff confirmed this revision by letter on June 24.

age treatment plant at Syracuse, New York. Paragraph 3(f) of the agreement specified that payment was to be made by defendant on the 15th day of the month preceding the month of each delivery, and paragraph five required plaintiff to furnish to defendant both a performance bond and a labor and materials bond, each in the amount of $800,000. Any amount paid as premiums for the bonds by plaintiff was to be reimbursed by defendant within 30 days after submittal of an invoice. Paragraph six provided that the agreement was to be construed according to the law of New York.

Between early June and mid-September of 1975, plaintiff made five shipments to defendant. The first delivery, invoiced on June 4, 1975 and composed of 400,000 linear feet of strand, was made upon receipt by plaintiff of advance payment in the amount of $61,056. When this shipment arrived at its destination in Syracuse, defendant found that eighteen of the 32 coils of strand shipped had unraveled, perhaps in transit after delivery by plaintiff to the shipper. Defendant notified plaintiff of the defect, whereupon plaintiff agreed, after inspecting the coils at Syracuse, to issue to defendant a credit for the cost of the coils, which it did in February 1976 upon receipt of the eighteen coils in Holland. At the same time, plaintiff agreed to ship sixteen replacement coils "on open account," but with the understanding that payment would be forthcoming after acceptance of the replacement coils by defendant. Though subsequently defendant accepted this second shipment which plaintiff invoiced on June 30, 1975, defendant never made payment.

Because of cash flow difficulties on the part of defendant which made infeasible the prepayment required by the contract, no shipments were made through mid-August 1975. Nevertheless, pursuant to telephone requests by defendant's general manager, Robert Curtis, to plaintiff's managing director, William Schwartz, seeking further shipments on open account waiving prepayment, plaintiff made two further deliveries—invoiced on August 25 and September 9—of six and eighteen coils respectively.

Defendant accepted both without complaint, but has to date failed to pay plaintiff for either of them.

A fifth and final shipment was made in mid-September and invoiced on September 16, but only after plaintiff had insisted upon and received assurance of prompt payment of $40,000 for the 24 coils included in this last delivery, which payment was received by plaintiff on September 19. On September 22 plaintiff submitted its final invoice covering $8,000 representing premiums paid by it to secure the two bonds provided for under paragraph five of the agreement.

During October and November 1975, plaintiff's director Schwartz had several conversations with defendant's general manager both by telephone and in person during the course of which it became evident—and Curtis subsequently confirmed—that defendant had been purchasing strand from another supplier, American Spring Wire of Cleveland, Ohio, upon terms which permitted deferred payment at least 60 days after shipment, rather than in advance as required by defendant's contract with plaintiff. In consideration of the falling market price of strand generally and of the large amount of strand already produced by plaintiff pursuant to the contract, Schwartz offered to modify the agreement in two respects: first, by permitting deferred payment by letter of credit at 60 days, and second, by reducing the price per thousand feet from $159 to $149. This offer was reaffirmed in a mailgram to defendant in early December and again in a letter dated December 23. To this proposal plaintiff received no reply.

In April 1976, Schwartz made a final attempt to salvage the contractual relationship between plaintiff and defendant when, accompanied by his counsel, he met with Curtis and defendant's Vice President, Walter Conlon, at defendant's offices in Deer Park, Long Island. He was informed by Conlon, however, that Conlon had no authority to receive shipment of any further strand from plaintiff under the contract.

Schwartz' attempts to contact defendant's President, Vincent DeLillo, or his father, Andrew DeLillo, were unsuccessful.

Thus, at the time of this first communication to plaintiff by defendant of its firm intention not to honor the terms of the May 1975 agreement, plaintiff had made five shipments, totalling 96 coils, and had submitted six invoices totalling $193,947.86, including the $8,000 in bond premiums.[3] Defendant, on the other hand, had made only two payments, totalling $101,124, but it had received from plaintiff in February 1976 a credit in the amount of $34,890.83 for the eighteen defective coils returned from the initial shipment. These amounts subtracted from the six invoices submitted by plaintiff resulted in an unpaid balance on strand delivered by plaintiff and accepted by defendant—including the amount of unreimbursed bond premiums—of $57,960.03. Of the approximately 1180 metric tons of strand provided for by the contract, defendant had accepted only 221.113 tons and had repudiated the remaining 958.887 tons, of which 317.891 tons had already been produced by plaintiff in anticipation of its obligations under the agreement.

*Plaintiff's Production Capacity and Third-Party Sales*

For the year 1975, plaintiff's estimated production capacity for steel strand was 13,000 metric tons and its projected production was 12,500 metric tons. This estimate of projected production was based on amounts actually manufactured by plaintiff in 1974, which was a boom year for the strand industry generally. The demand and market price began to decrease in 1975, however, and plaintiff's actual production dropped from 8,788 metric tons in 1974 to 6,923 metric tons in 1975.

Faced with this declining trend, plaintiff's director Schwartz became concerned in late 1975 about the still undelivered strand which had been produced during the second and third quarters of 1975 in anticipation of shipments required pursuant to the schedule in ¶ 3(e) of the contract. Though continuing efforts to salvage the contract and to accommodate the defendant regarding its financial difficulties, Schwartz determined to sell to third parties—and beginning in December 1975 did sell—portions of the strand originally intended for delivery to defendant. These sales were made at prices below that specified in the contract with defendant, but at commercially reasonable amounts in accord with market levels generally at the time of the sales. Because plaintiff manufactures only to order and not to stock and in view of the condition of the strand market at the time, it would have been commercially inadvisable to retain the undelivered strand awaiting resolution by defendant of its cash flow difficulties in expectation that defendant would then decide to comply with its obligations under the contract. Accordingly, between December 12, 1975 and December 23, 1977, plaintiff sold to various third-party purchasers 317.891 metric tons of strand previously produced for defendant but for which defendant neither submitted payment nor requested delivery.

3. The invoiced amounts were stipulated to by the parties as follows:

| Invoice No. | Date of Invoice | Number of Coils | Amount |
|---|---|---|---|
| 30881 | June 4, 1975 | 32 | $ 62,074.75 |
| 30933 | June 30, 1975 | 16 | 31,085.69 |
| 31063 | August 25, 1975 | 6 | 11,647.58 |
| 31108 | September 8, 1975 | 18 | 34,780.07 |
| 31120 | September 16, 1975 | 24 | 46,386.77 |
| | | | $185,974.86 |
| 31120–A | September 22, 1975 (reimbursable bond premiums) | | 8,000.00 |
| | | | $193,974.86 |

*Estimated Costs of Production*

Plaintiff's claim for lost profit damages on the undelivered 958.887 metric tons of strand covered by the contract requires that the Court determine plaintiff's costs of production which became unnecessary as a consequence of defendant's refusal to accept delivery. Accordingly, after examination of all costs, we find (i) that cost of production to plaintiff in 1975 of a metric ton of one-half inch strand (270K), excluding fixed costs, was $394.57[4] and that the fixed cost of such production was $134.51[5] per metric ton; (ii) that production of the undelivered tonnage would not have increased plaintiff's fixed costs beyond the level required for strand already produced and accepted; and (iii) that, therefore, production of the additional 958.887 tons of strand would have aggregated only the amount of its variable costs which, as stated, were $394.57. This amount, subtracted from the net sales price—or "ex works" price[6]—of

4. Variable costs per metric ton were computed as the sum of raw material, wages, gas, electricity, auxiliary materials, and unavoidable loss of raw material during the four stages of the production process. The evidence adduced at trial regarding these costs can be summarized by the following computation (guilders per metric ton):

| | | | |
|---|---|---|---|
| Raw Material (wire rod) | | | 790.00 guilders |
| (1) Patenting | Wages | 45.16 | |
| | Gas | 6.78 | |
| | Lead | 6.74 | |
| | Others | 2.10 | |
| | Loss | 23.70 | |
| | | 84.48 | 84.48 |
| (2) Pickling | Wages | 3.75 | |
| | KPT | 6.65 | |
| | Others | 4.40 | |
| | Loss | 4.37 | |
| | | 19.17 | 19.17 |
| (3) Drawing | Wages | 24.18 | |
| | Electricity | 11.29 | |
| | Others | 5.53 | |
| | Loss | 10.72 | |
| | | 51.72 | 51.72 |
| (4) Stranding | Wages | 65.09 | |
| | Electricity | 17.04 | |
| | Others | 7.36 | |
| | Loss | 26.47 | |
| | | 115.96 | 115.96 |
| Straps | | 4.00 | 4.00 |
| TOTAL | | | 1,065.33 guilders per metric ton |

Converted to dollars at the conversion factor agreed upon by the parties (2.7), the variable costs of production per metric ton total $394.57.

5. Included in this determination of fixed costs were wages, repairs, maintenance, depreciation, and personnel, plant and office, internal transportation, laboratory, and general costs, each of which is divided into amounts attributable to the four stages of production (*see* note 4 *supra*). The total cost per metric ton, as shown by plaintiff, was 328.32 guilders, which when converted to dollars at the 2.7 conversion factor equals $134.51.

6. The contract price of $159 per thousand linear feet—or $673.72 per metric ton—included certain costs of C.I.F. delivery which plaintiff in effect passed on to defendant by including them in the contract price. Because these shipping costs would not be incurred by plaintiff for any strand produced but not delivered, they must necessarily be deducted from the contract

approximately $144 per 1,000 linear feet of strand—$608.47 per metric ton—leaves a lost profit value of $213.90 per metric ton.

## II. APPLICABLE LAW

■ It is an established principle of New York law that the parties to a contract may consent, in the absence of a strong countervailing public policy, to the law to be applied with respect to the contract. U.C.C. § 1–105 (McKinney); *Martin v. City of Cohoes*, 37 N.Y.2d 162, 166, 371 N.Y.S.2d 687, 690, *on remand*, 50 App.Div.2d 1035, 377 N.Y.S.2d 757 (1975). As noted above, paragraph six of the agreement between the parties in this case provided that "[t]his Agreement shall be construed according to the Laws of the State of New York, U.S.A." Thus, the Uniform Commercial Code ("U.C.C."), as enacted in New York, is applicable to the diversity action now before the Court.

*Steel Strand Accepted by Defendant*

Plaintiff first contends that it is entitled to recover from defendant amounts due for strand accepted by defendant but for which no payment has been made. Defendant argues, on the other hand, that due to plaintiff's failure to comply with the precise terms of the delivery schedule in paragraph 3(e) of the contract and the requirement of paragraph five that plaintiff furnish the bonds "before starting production," the contract did not come into existence and defendant is not bound by its terms.

U.C.C. § 2–607 is directly applicable, and it provides, in pertinent part, as follows:

(1) The buyer must pay at the contract rate for any goods accepted.

(2) Acceptance of goods by the buyer precludes rejection of the goods accepted and if made with knowledge of a non-

conformity cannot be revoked because of it unless the acceptance was on the reasonable assumption that the non-conformity would be seasonably cured . .

(3) Where a tender has been accepted (a) the buyer must within a reasonable time after he discovers or should have discovered any breach notify the seller of breach or be barred from any remedy

. . .

(4) The burden is on the buyer to establish any breach with respect to the goods accepted.

\* \* \* \* \* \*

■ Defendant has made no showing that any of the strand tendered by plaintiff and accepted by defendant was in any way defective or that defendant notified plaintiff of a non-conformity in the tender at any time, much less within a reasonable time as U.C.C. § 2–607(3) requires. In the absence of such a showing, defendant is obligated to pay "at the contract rate" for all strand accepted. Any objection to the tender which defendant might have made based on plaintiff's deviation from the exact terms of the contract should have been made at the time of delivery or within a reasonable time thereafter. Based on its failure to do so and in consideration of its own apparent disregard of the schedule in repeatedly requesting further deliveries, we conclude that defendant waived any objections which it might have asserted had they been timely raised. *G. and D. Poultry Farms, Inc. v. Long Island Butter and Egg Co.*, 33 A.D.2d 685, 306 N.Y.S.2d 243, 244 (2d Dept.1969); *Walter E. Heller and Co. v. American Flyers Airline Corp.*, 459 F.2d 896, 901 (2d Cir. 1972). Similarly, plaintiff is entitled to recover the amounts which it paid for bond premiums pursuant to paragraph five of the agreement, notwithstanding its failure to furnish promptly the bonds

price in computing any lost profit damages to which plaintiff might be entitled. Accordingly, the "ex works" price of the strand was computed by deducting the following costs from the contract price:

| | | | |
|---|---|---|---|
| ½% insurance | $ 3.37 | per metric ton | |
| ocean freight (Rotterdam – New York) | 50.25 | " " " | |
| inland freight (NDI – Rotterdam) | 11.63 | " " " | |
| | $65.25 | " " " | |

before starting production. We note that this failure in fact caused no damage to defendant.

*Divisibility of the Contract*

Plaintiff next seeks lost profit damages for the 958.887 metric tons of strand covered by the contract but refused by defendant. Defendant asserts, however, that the agreement between the parties contemplated not an indivisible installment contract but a series of severable contracts in which advance payment by defendant was a condition precedent to any obligation on plaintiff's part to deliver, or possibly even to manufacture, the quantities of strand set forth in the schedule of deliveries in paragraph 3(e) of the agreement. Thus, according to defendant, it had no obligation to pay for any strand which it neither requested nor accepted.

■■ In determining whether a contract is divisible or entire, the controlling element is the intent of the parties, to be determined in light of the language employed by the parties and the circumstances existing at the time of contracting. 5 Williston, *Contracts* §§ 861–63 [1961]; *Christian v. Christian*, 42 N.Y.2d 63, 74, 396 N.Y.S.2d 817, 824, 365 N.E.2d 849 (1977); *Rudman v. Cowles Communications, Inc.*, 30 N.Y.2d 1, 14, 330 N.Y.S.2d 33, 42, 280 N.E.2d 867 (1972); *Bird v. Computer Technology, Inc.*, 364 F.Supp. 1336, 1342 (S.D.N.Y.1973); *Rogers v. Graves*, 254 App.Div. 467, 5 N.Y. S.2d 967, 970–71 (3d Dept.1938), *rev'd on other grounds*, 279 N.Y. 375, 18 N.E.2d 626 (1939). Though divisibility of performance may be one indication that the parties intended the contract to be divisible, such a finding of intent need not follow where other circumstances suggest a contrary intention. 5 Williston, *Contracts, supra*, at 263–64; *Norrington v. Wright*, 115 U.S. 188, 203, 6 S.Ct. 12, 29 L.Ed. 366 (1885); *Burger King Corp. v. Family Dining, Inc.*, 426 F.Supp. 485, 492 (D.Pa.1977). Thus, the question is essentially one of fact, and no uniform formula has been devised to resolve all questions of contract divisibility. *Rogers v. Graves*, 5 N.Y.S.2d at 970.

■ We must, therefore, examine not only the terms of the contract but the circumstances surrounding its execution as well. The May 2, 1975 agreement between the parties here is not explicit with respect to their intention in this case. Though defendant argues that the advance payment provision in paragraph 3(f) was inserted at its request for the purpose of dividing the contract, other provisions suggest a contrary intention of the parties. Paragraph 3(a) obligates plaintiff to "manufacture, furnish and deliver 5,000,000 linear feet (U.S.) [of strand]," and paragraph 3(e) sets forth a schedule of deliveries to begin in June 1975 and continue through the end of the year. Had the parties contemplated that these provisions be included merely as goals attendant to a divisible contract and without binding force on either party, we believe such intention would have been clearly expressed, particularly in view of the expense and preparation necessary for plaintiff to produce the substantial quantities of strand required in each shipment. This conclusion is reinforced by subsequent correspondence between the parties initiated by defendant to revise the delivery schedule by adding a September shipment of 600,000 linear feet inadvertently omitted from the original contract.[7] This revision suggests that the schedule was intended not as mere heuristic surplusage but rather as a listing of installments for delivery of the entire 1180 metric tons by which both parties considered themselves bound. To interpret the agreement as defendant suggests would require that both these provisions be deemed ineffective, thus contravening the established principle of law favoring that construction which will make every part of the contract effective. *Fleischman v. Furgueson*, 223 N.Y. 235, 239, 119 N.E. 400 (1918); *M. O'Neil Supply Co. v. Petroleum Heat and Power Co.*, 280 N.Y. 50, 56, 19 N.E.2d 676 (1939); *Corhill Corp. v. S. D.*

---

This amount, deducted from the contract price of $673.72 per metric ton, results in the ex works price of $608.47 per metric ton.

7. *See* note 2 *supra*.

*Plants, Inc.,* 9 N.Y.2d 595, 599, 217 N.Y.S.2d 1, 3, 176 N.E.2d 37 (1961). We find that the parties intended each provision of the contract to be effective.

There are other factors which lend further credence to this interpretation. Paragraph 5 of the contract, obligating plaintiff to furnish two bonds of $800,000 each, would be excessive and unnecessary if the obligations of the parties extended only to each installment separately and not to the total amount of 5,000,000 linear feet stated in paragraph 3(a). Second, contrary to what defendant now asserts, deposition testimony of Grand's President, Vincent De-Lillo, indicates that defendant did agree with plaintiff to purchase 5,000,000 linear feet by the end of 1975 and, further, that defendant had agreed to purchase such a large quantity in order to secure at 1975 prices as much as possible of the total 9,000,000 linear feet ultimately necessary for the Syracuse project. Third, William Schwartz testified that the price initially quoted to defendant was $172 per 1,000 linear feet and that this figure was reduced to the contract rate of $159 per 1,000 linear feet in part because of defendant's commitment to purchase 5,000,000 linear feet. Finally, the evidence indicates that the contract was drafted by defendant. Even assuming that the agreement is ambiguous, it is to be interpreted against the draftor. *67 Wall St. Co. v. Franklin National Bank,* 37 N.Y.2d 245, 250, 371 N.Y.S.2d 915, 918, 333 N.E.2d 184 (1975); *Chase Manhattan Bank, N.A. v. Mehlman,* 59 App.Div.2d 694, 398 N.Y.S.2d 686, 687 (1st Dept.1977); *Gillette v. Heinrich Motors, Inc.,* 55 App.Div.2d 841, 390 N.Y.S.2d 330, 331 (4th Dept.1976). We conclude, therefore, that the contract was intended to be entire, rather than divisible, and that defendant's refusal to accept further shipments was a breach of its obligations under the contract. Accordingly, plaintiff is entitled to recover lost profit damages on all strand provided for by the contract but not accepted by defendant.

*Computation of Lost Profit Damages*

■ Defendant claims that any lost profit damages to which plaintiff is entitled must be computed in accord with U.C.C. § 2–708(1), which requires that a set-off be made for all profits received by plaintiff as a result of sales to third parties of strand produced pursuant to its contract with defendant. Plaintiff cites U.C.C. § 2–708(2) as the proper measure, however, in view of its capacity to produce strand not only under the contract but for third parties as well. Plaintiff reasons that any sales to third parties would have been made regardless of defendant's breach and that, therefore, defendant is not entitled to a set-off for proceeds from third-party sales.

U.C.C. § 2–708 provides, in part, as follows:

§ 2–708 *Seller's Damages for Non-acceptance or Repudiation*

(1) . . . [T]he measure of damages for non-acceptance or repudiation by the buyer is the difference between the market price at the time and place for tender and the unpaid contract price together with any incidental damages provided in this Article, but less expenses saved in consequence of the buyer's breach.

(2) If the measure of damages provided in subsection (1) is inadequate to put the seller in as good a position as performance would have done then the measure of damages is the profit (including reasonable overhead) which the seller would have made from full performance by the buyer, together with any incidental damages provided in this Article, due allowance for costs reasonably incurred and due credit for payments or proceeds of resale.

The leading New York decision applying this provision is *Neri v. Retail Marine Corp.,* 30 N.Y.2d 303, 334 N.Y.S.2d 165, 285 N.E.2d 311 (1972). In that case defendant-seller counterclaimed to recover lost profits upon buyers' repudiation of a contract to purchase a boat, even though the boat had subsequently been sold by defendant to third-parties for the same price that plaintiff-buyers had contracted to pay. Upon a finding that defendant could have supplied

both the breaching buyers and the third-parties, the court held subsection (2) of U.C.C. § 2–708 applicable because the general rule set forth under subsection (1) was "inadequate to put the seller in as good a position as performance would have done." *Id.* 334 N.Y.S.2d at 169, 285 N.E.2d at 314. Moreover, it determined that the final sentence of subsection (2)—"due credit for payments or proceeds of resale"—was intended to refer only to the "privilege of the seller to realize junk value when it is manifestly useless to complete the operation of manufacture." *Id.* 334 N.Y.S.2d at 169 n.2, 285 N.E.2d at 314. *See also Famous Knitwear Corp. v. Drug Fair, Inc.*, 493 F.2d 251, 253–55 (4th Cir. 1974); *Louisiana Sulphur Carriers, Inc. v. Gulf Resources and Chemical Corp.*, 53 F.R.D. 458, 463 (D.Del.1971); *Restatement of Contracts*, § 336, comment c [1932]; McCormick, *Damages* § 41 [1935].

Here the evidence is clear that plaintiff had sufficient production capacity to supply not only the approximately 1180 metric tons of strand required by its contract with defendant but also the 317.891 metric tons which were sold to third-parties. As noted *supra*, plaintiff had a total estimated capacity of 13,000 metric tons in 1975, a projected capacity of 12,500 metric tons, and actual sales of 8,788 metric tons in 1974 and 6,923 metric tons in 1975. These statistics leave little question as to plaintiff's capacity to supply both defendant and the third-parties. Defendant attempts to distinguish *Neri* by noting that plaintiff is a manufacturer rather than a retail dealer and that plaintiff produces only to order rather than maintaining an inventory. Both distinctions, it seems to us, are unpersuasive in demonstrating that subsection (1) of U.C.C. § 2–708 is appropriately applied in this case, particularly in view of the fact that the damages measure used in *Neri* had previously been employed only in cases where the seller was a manufacturer. *Neri v. Retail Marine Corp.*, 334 N.Y.S.2d at 169.

Accordingly, under the law of New York as established in *Neri*, we find that the usual contract-market damages rule set forth in subsection (1) of U.C.C. § 2–708 is inadequate to put the plaintiff in as good a position as performance would have done and that plaintiff is entitled to the profit (including reasonable overhead) which it would have made from full performance by defendant. Thus, no set-off will be allowed for profits earned by plaintiff through sales to third-parties.

■ One other matter with respect to computation of such damages must be noted. In view of our finding *supra* that production by plaintiff of the 958.887 tons not accepted by defendant would not have increased plaintiff's fixed costs beyond the level required for production of strand accepted by defendant, we hold that only plaintiff's variable costs of production should be considered in computation of the net lost profits to which we find plaintiff entitled. *Vitex Manufacturing Corp. v. Caribtex Corp.*, 377 F.2d 795 (3d Cir. 1967); *Buono Sales, Inc. v. Chrysler Motors Corp.*, 449 F.2d 715, 720 (3d Cir. 1971); *Poppenberg v. R. M. Owen and Co.*, 84 Misc. 126, 145–46, 146 N.Y.S. 478, 489 (Sup.Ct. Erie County, 1914), *aff'd*, 165 App.Div. 946, 150 N.Y.S. 1107 (4th Dept.), *aff'd*, 221 N.Y. 569, 116 N.E. 1070 (1917); *see also* Childres and Burgess, *Seller's Remedies: The Primacy of U.C.C. 2–708*, 48 N.Y.U.L.Rev. 833, 846–47 (1973).

Because defendant introduced no evidence in support of its counterclaim for $1,275, that counterclaim is hereby dismissed.

### III.  CONCLUSION

In sum, we find, based on the evidence adduced at trial and in the pleadings, that plaintiff NDI is entitled to recover damages as a result of defendant Grand's breach of the May 2, 1975 contract for the sale of steel strand. Such damages shall consist of the following: (a) $57,960.03 plus interest for strand accepted by defendant—including $8,000 for unreimbursed bond premiums—but for which no payment was made; and (b) $205,109.48 plus interest in lost profits, computed by multiplying the lost profit value of $213.90 per metric ton times the balance of the 5,000,000 linear feet—958.887

metric tons—of strand provided for by the contract, without set-off for any amounts gained by plaintiff as a result of sales to third-parties. Interest shall be computed at the applicable rate under New York law of 6% per year from the date of defendant's breach, which we find occurred on October 1, 1975.

Accordingly, judgment in accordance with the above is hereby ordered to be entered in favor of plaintiff against defendant for the amount of $263,069.51, together with interest and costs.

SO ORDERED.