John J. PIERSON, Louis
Degange, Plaintiffs,

v.

WILLETS POINT CONTRACTING CORP., a New York Corporation, and Haulage Enterprises Corp., a New York Corporation, Defendants.

No. 88–CV–0743 (DRH).

United States District Court,
E.D. New York.

Sept. 19, 1995.

Crupain & Greenfield, New York City, for Plaintiffs.

Berman Paley Goldstein & Kannry, New York City, for Defendant Willets Point Contracting Corp.

Wren & Schmid, East Islip, NY, for Defendant Haulage Enterprises Corp.

### FINDINGS AND FACTS AND CONCLUSIONS OF LAW

HURLEY, District Judge.

#### *INTRODUCTION*

By complaint dated March 10, 1988, plaintiffs commenced a diversity action against the corporate defendants for monies allegedly due under a contract dated February 10, 1986.

In its answer, defendant Willets Point Contracting Corporation ("Willets"), *inter alia,* counterclaimed for $75,000 it paid to plaintiffs pursuant to what it claims were anticipated "consulting agreements" which never materialized.

The answer of defendant Haulage Enterprises Corporation [1] contains a series of denials, coupled with references to "all the terms and conditions" of the February 10, 1986 Agreement, and of the "contract between defendants and the Town of Oyster Bay"

---

1. Hereinafter referred to as "Haulage Enterprises," which is to be distinguished from the "Haulage Group" of which the president of Haulage Enterprises was a member.

(Answer ¶¶ 2–3.) In addition, Haulage Enterprises has asserted an indemnification cross claim against Willets for any sums it, Haulage Enterprises, may be called upon to pay to plaintiffs. That cross claim is based on the Release Agreement between defendants dated August 19, 1987.

The case was tried non jury before the undersigned in June of 1994.

## FINDINGS OF FACTS

Initially, the largely undisputed facts in the case will be presented by way of background. That will be followed by a synopsis of the trial testimony of each witness, as well as the Court's finding of fact regarding the contested matters.

### 1. *Factual Background.*

In early 1986, a group consisting of (1) Pasquale DiMatteo, who was the President of defendant Haulage Enterprises, (2) John Cameron, (3) Joseph Longo, (4) plaintiff J.J. Pierson and, (5) plaintiff Louis J. DeGange (collectively, the "Haulage Group"), began preparing a bid for a waste disposal contract with the Town of Oyster Bay, Nassau County, New York. The Haulage Group had made arrangements for O'Hara Construction to obtain the multi-million bond needed to submit the bid proposal. However, at the last moment, O'Hara withdrew from the venture. In an effort to remedy that situation, the Haulage Group contacted defendant Willets, an established contractor with considerable experience in major municipal construction projects, although devoid of experience in the waste disposal field. The Haulage Group needed Willets to obtain the bond, and Willets—after some discussion with various members of the Haulage Group—became interested in the Oyster Bay project. As a result, the February 10, 1986 Agreement was executed. (Pls.' Ex. 1.)

The Agreement—which is the focal point of the present dispute—was prepared by plaintiff Pierson and unfortunately is not a model of clarity. Its essential provisions are as follows:

1. Willets and Haulage Enterprises would jointly prepare the bid to the Town of Oyster Bay, which bid would be submitted solely in Willets's name;

2. Willets was required to secure all bonds needed to bid on the project;

3. Haulage Enterprises was to supply disposal locations, *i.e.* landfills for the solid waste;

4. If Willets was successful in obtaining the Oyster Bay contract:

a) it would name Haulage Enterprises as the subcontractor to perform the contractual obligations with Oyster Bay;

b) Willets would secure all bonds called for under the Oyster Bay contract. However, Haulage Enterprises was required to "secure and execute a performance and payment bond in and for the amount of one-half of the performance bond required under the [Oyster Bay] contract." That bond was to be delivered by Haulage Enterprises to Willets after the awarding of the contract, and was to "set forth assurances to Willets that Haulage would assume one-half (½) of Willets's liability to perform the contract." (*Id.* at 2, (First) ¶ 6.);

c) pursuant to the second paragraph 6 of the Agreement, the parties were to be paid as follows:

Willets and Haulage [Enterprises] shall divide net profits (and losses) on an equal basis after the following professional fees are paid:

\*　　\*　　\*　　\*　　\*　　\*

c. To J.J. Pierson, Esq., [ ] One Dollar ($1.00) per ton of solid waste transferred, hauled and disposed during the duration of the Contract. This shall represent payment for Legal Services. Payment shall be made in accordance with payments made by the Town to Willets.

d. To Louis J. DeGange [ ], One Dollar ($1.00) per ton of solid waste transferred, hauled and disposed of during the duration of the Contract. This shall represent Transportation Consultant Services. Payment ·shall be made in accordance with payments made by the Town to Willets.

In April of 1986, Willets was awarded the Oyster Bay contract. Haulage Enterprises thereafter performed a portion of the work, for which it was paid by Willets the following sums: $100,000 on June 10, 1986; $4,800 on June 20, 1986; $135,000 on June 24, 1986; $15,353.17 on June 26, 1986; and $150,000 in November 1986. In addition, Willets paid the following sums to Pierson: $15,000 on July 16, 1986; $10,000 on August 8, 1986; $5,000 on August 14, 1986; $15,000 on September 19, 1986; $15,000 on November 6, 1986; and $15,000 on November 14, 1986. (Pre–Trial Order ¶ (8)–(9).)

On August 19, 1987, Willets and Haulage Enterprises executed an agreement entitled "Release Agreement." (Haulage Ex. A.) In that instrument, the parties agreed "to declare ... [the] pre-bid agreement [of February 10, 1986] null and void," and for Willets to pay $655,025 to Haulage Enterprises as a return of capital invested, and also to identify Haulage Enterprises "for any claims by parties [2] to the [February 10, 1986] agreement." In addition, Willets made arrangements to acquire the three balers that Haulage Enterprises had purchased as the subcontractor for the Oyster Bay project.

In any event, Willets—initially with Haulage Enterprises, and after August 19, 1987 alone—transferred, hauled and disposed of 610,268.81 tons of solid waste for Oyster Bay from April 8, 1986 to August 31, 1988. (Pre–Trial Order ¶ C, C(7).)

The scenario thus far recited rests either on the stipulation of the parties, (Pre–Trial Order ¶ C), or on evidence that was largely undisputed during the trial. Against that backdrop, attention will now be directed to contested matters, including, *inter alia,* what transpired between the time the Oyster Bay contract was awarded in April of 1986 and August 19, 1987, *i.e.* the date Willets and Haulage Enterprises parted company via the execution of the Release Agreement.

## 2. *Synopsis of Trial Testimony.*

The following witnesses were called by plaintiffs:

### a. *Kenneth Tully.*

The first witness called by plaintiffs was Kenneth Tully, the president of Willets, as well as a 50% shareholder of the corporation. Mr. Tully, after reviewing how his corporation became involved with the Haulage Group, detailed the post-bid problems that developed. Those problems were traceable to, *inter alia,* the fact that Oyster Bay closed its incinerator, thereby generating more refuse than anticipated.

In addition, the primary and secondary landfills sites in Pennsylvania were closed shortly after the job commenced. This necessitated trips to distant landfills in the northeast and elsewhere. Problems also developed in the transportation system which the plaintiff DeGange and, to a lesser extent, Pierson had established for the movement of the waste.

The project was losing money and required the infusion of additional capital from Willets and Haulage. Because of the changed circumstances and concomitant losses that were being sustained, Oyster Bay granted Willets an increase in the rate per ton from $72 to $115 in April of 1987.

Towards the end of 1986, however, Haulage Enterprises was no longer in a position to contribute more capital to the then losing venture. Moreover, DiMatteo was unable to post a bond for one-half of the payment and performance exposure assumed by Willets under the Oyster Bay contract, nor was he able to furnish the alternative to such bond which the two corporations agreed to after the February 10, 1986 Agreement was signed, *viz.* a letter of credit. Therefore, in August of 1987, the second of the two executed contracts between defendants Willets and Haulage was executed, that being the previously mentioned Release Agreement.

Mr. Tully also explained that the contract of February 10, 1986 was prepared by Pierson, and that Pierson served as the attorney for the Haulage Group for the matters that transpired thereafter between the two corpo-

---

**2.** Although defendants now maintain that plaintiffs were essentially strangers to pre-bid agreement, devoid of any legally cognizable claims

thereunder, the "parties" mentioned in the Release Agreement clearly are the plaintiffs, together with Longo and Cameron.

rations, including the unsuccessful efforts to have an executed subcontract for the Oyster Bay project as called for in the February agreement.

### b. *John J. Pierson.*

The next witness called by plaintiffs was John J. Pierson. Pierson, who was admitted to the bar in New Jersey in 1983, brought considerable experience in the waste disposal business to the Haulage Group.[3] He testified as to how he met DeGange and DiMatteo, and of the Haulage Group's efforts to draft a bid for the Oyster Bay contract. Towards that end, he estimated labor costs, assisted DeGange in preparing a system for the transportation of the solid waste, and also was involved, with DeGange and Longo, in securing landfill sites.

Pierson said that 95% of his work on the project was completed by February 10, 1986. He anticipated that his functions thereafter were to be largely ministerial in nature although he stood ready, willing and able to provide whatever assistance was requested *vis a vis* the Oyster Bay contract.

Pierson indicated there was never any discussion about a consulting agreement until Alvin Goldstein, Willets's attorney, broached the subject on April 29, 1986. This was, in Pierson's view, an effort by Willets to change the original contract.

Pierson discussed Goldstein's request with DiMatteo, who told him to prepare the requested agreement. That direction was coupled with a reassurance from DiMatteo that it would not effect "your $1.00 a ton deal." Several drafts of such an agreement were prepared, but none was ever signed.

Willets—acting through Charles McDonald—soon took over the day to day operation of the project. The Haulage Group was being "forced out," in Pierson's judgment. Moreover, Pierson was not being paid which he discussed with DiMatteo, who assured him that he would be paid. Eventually, as previously noted, payments were made to Pierson, which sums he shared with Longo

and DeGange. At the insistence of Willets's Harry Irwin, Pierson submitted "consulting agreement" invoices for each payment, but never agreed to modify what he perceived to be his contractual right to $1 per ton regardless of post February 10, 1986 events.

During the post contract period, Pierson was rarely called upon, but when he was asked to perform a task he did so. His last activity on behalf of the joint venture was in February of 1987, when he was asked to address a problem at the transfer station in Oyster Bay. The particular problem was to find a baler machine, which he did.

### c. *Richard J. Solomon.*

The next witness called by plaintiffs was Richard J. Solomon, who was engaged in the trucking business. He testified that in April or May of 1986, he met with McDonald of Willets who said he was in charge of the project and that neither DeGange nor Pierson was involved in the daily operations.

### d. *Louis J. DeGange.*

Plaintiff DeGange testified that he is a civil engineer with a strong technical background in the landfill business. He detailed his activities in helping to fashion the bid proposal, and discussed the February 7, 1986 meeting with Willets.

After the Oyster Bay contract was awarded to Willets, Mr. McDonald, according to DeGange, ignored the transportation system which he, and others in the Haulage Group had established, and told him that he "was out of the deal—get out." The witness indicated that he declined to follow that directive and remained available to render services if requested to do so.

During cross examination DeGange indicated that he felt entitled to the $1 per ton figure based on his work before the Oyster Bay contract was awarded. He also explained that Longo was a member of the Haulage Group mainly because of his contact with Joseph Amity, the owner and operator

---

**3.** Pierson testified that Haulage Enterprises is a completely separate entity from the Haulage Group which DiMatteo had assembled for pur-

poses of submitting a bid for the Oyster Bay contract.

of the primary landfill site designated in the bid.

The following witnesses were called by the defendants:

### e. *Alvin Goldstein.*

The first witness called by the defendant Willets was Alvin Goldstein, an attorney admitted to the New York State bar in 1953. Willets is, and was at all times relevant to this litigation, a client of his, pursuant to a retainer agreement. Yet he first learned of the February 10, 1986 Agreement weeks after its execution.

On April 29, 1986, a meeting was held in Goldstein's New York City office to review a proposed subcontract between Willets and Haulage Enterprises. The attendees were Tully, Pierson and Goldstein. Goldstein had problems with the proposed subcontract, (Defs.' Ex. B), that Pierson had prepared at his, *i.e.* Goldstein's, request since it did not dovetail with the February 10, 1986 Agreement. Among other things, the proposed agreement had no reference to Haulage obtaining the required bond in favor of Willets. Mr. Goldstein also felt that a separate contract should be prepared for plaintiffs, specifying, *inter alia*, that any payments to them would be contingent upon Haulage Enterprises's meeting its obligations under the initial contract, and setting forth their obligations in greater detail. He said that Pierson seemed in agreement with his concerns. Also at the April 29th meeting, Goldstein said that should DiMatteo be unable to obtain the necessary bond called for in the February 10, 1986 Agreement, that a letter of credit in favor of Willets would suffice.

Following that meeting, Goldstein sent Pierson a letter dated May 5, 1986, detailing the substance of the April 29, 1986 meeting. (Defs.' Ex. C.) By letter dated May 23, 1986, Pierson replied to Goldstein's letter. (Defs.' Ex. D.) Attached to the May 23, 1986 letter were two consulting agreements that had been prepared by Pierson. (Defs.' Ex. F–G.) Those agreements were never signed.

Goldstein testified that he asked time and time again for Haulage Enterprises to provide either a bond or letter of credit. Until such security was furnished to protect Willets, no agreement beyond that already executed on February 10th would be signed by Mr. Tully.

On cross examination, Goldstein reiterated that he did not know about the February 10, 1986 agreement until April of 1986, and that, in his judgment, the February agreement prepared by Pierson should have expressly, instead of just implicitly, delineated the nexus between the right to payment for members of the Haulage Group—including the plaintiffs—and their post-contract performance of required duties. For that reason, he felt additional agreements should be prepared and executed.

### f. *John Cameron.*

The next witness was John Cameron, a self-employed engineer with considerable experience in the transportation of waste. He testified that, as part of the Haulage Group, he was instrumental in preparing the Oyster Bay bid. In enlisting his involvement, DiMatteo explained that he had already arranged for trucking and landfills, but that he needed his expertise regarding such matters as cost projections, transfer stations, and the obtaining of the necessary permits.

Mr. Cameron detailed the operational and regulatory problems that developed after the contract was awarded. The costs of the project soared, with trucking becoming a major problem.

Mr. Cameron testified that as initial trucking problems materialized, he contacted De-Gange who unsuccessfully sought to correct the situation. After a period of time, De-Gange refused to return Cameron's phone calls and by the summer of 1986, or the early fall of that year, DeGange was basically absent from the operation. Similar efforts by Cameron to involve Pierson in the problem solving efforts were unsuccessful. As a result, Willets assumed responsibility for transporting the waste. This was accomplished by the witness, and the son of one of Tully's friends, forming Omni Trucking Corp., which Tully essentially designated as the prime trucking contractor for the duration of the project.

During cross examination, Cameron acknowledged that much of the trucking problem was traceable to the fact that Oyster Bay generated more garbage than anticipated. He also explained that he was to receive $1 per ton more than plaintiffs under the February 10th agreement in recognition of the fact that his company, Omni Technical, would operate the transfer station if Willets was the successful bidder.

The witness testified Willets unsuccessfully re-bid the Oyster Bay contract in 1988. That ended the witnesses, and Willets's, contact with the Oyster Bay facility, but for the present litigation.

The witness again listed the members of the Haulage Group and their respective responsibilities: a) he was the transfer station operator and the liaison with Oyster Bay; b) Pierson was to be counsel for the team; and c) DeGange and Longo were involved in securing landfill sites, with DeGange also being involved in establishing the necessary trucking procedures. The witness said that the group was "a full service team" which only needed Willets for the bond. However, Willets insisted on some type of oversight given the fact that it would be posting a multimillion dollar bond.

g. *Harry C. Irwin.*

At the time of trial, Mr. Irwin worked for Tully Construction, but had been a principal of Willets from a point in the 1970's into the late 1980's. As such, he was involved in a number of major municipal construction projects. However, neither he nor Willets had any experience in waste disposal prior to their meeting with the Haulage Group.

Irwin explained that the February 10, 1986 meeting resulted in the formation of a joint venture. Willets was to submit the bid prepared by the Haulage Group and furnish the required bonds. However, all waste disposal obligations called for under the Oyster Bay contract—should it be awarded to Willets— were to be performed by the Haulage Group. Nevertheless, Willets was to share general oversight responsibilities. In an effort to reduce their understanding to writing, the February 10, 1986 Agreement was prepared and executed.

The witness highlighted some of the difficulties encountered after the contract was awarded in April of 1986. For example, transportation problems developed in May of that first year, particularly at the staging area in New Jersey. DeGange unsuccessfully endeavored to correct the situation. Moreover, the Amity facility in Pennsylvania, selected by the Haulage Group as the primary landfill site, was substandard to the extent that trucks often became immobilized in mud when endeavoring to deposit waste, thereby further disrupting the joint venture's efforts to realize a profit. Irwin was of the opinion that the unanticipated large volume of waste from Oyster Bay was only one, rather than the main reason for the initial problems.

Irwin also provided the substance of his conversation with Pierson in the early summer of 1986 concerning compensation for plaintiffs. Mr. Irwin testified that he told Pierson that an invoice would have to be submitted prior to a check being issued but, contrary to Pierson's testimony, he never indicated what notation should be placed on the invoice. His last contact with Pierson was in 1986.

Mr. Irwin explained he could not distribute monies to Pierson without the approval of Tully, and also, he believed, of DiMatteo given the joint venture relationship between the two corporations. An invoice reflecting the reason for a requested payment was thus required.

The plaintiffs called the following rebuttal witnesses:

h. *Gerald Foster.*

By way of a rebuttal case, plaintiffs called Gerald Foster. Mr. Foster was the president of a carting corporation. He testified that he used the Amity landfill from May of 1986 to the time it closed. He testified he found the facility to be a "good" landfill, contrary to the dire reports provided by defendant Willets.

i. *John J. Pierson.*

As plaintiffs' second rebuttal witness, Pierson was recalled. He testified that his con-

tacts with Willets extended into 1987. Specifically, he sent a letter on November 10, 1987, to Tully concerning payment for his services. That letter was preceded by a number of contacts with Tully earlier in the year, including a personal contact in mid-July and a telephone conversation in September. Pierson's July inquiry was met by the statement that a project audit was to be conducted by Oyster Bay, at the conclusion of which Pierson's request would be addressed.

The audit was scheduled for August of 1987 so Pierson recontacted Tully in September. At that time Tully told Pierson to call back in October. Pierson made efforts to contact Tully in October, without success. Accordingly, he wrote the previously mentioned November 10th letter to Tully. Mr. Pierson indicated that he heard the testimony of Cameron and Irwin. He acknowledged that problems developed "early on" and that, as a result, periodic meetings were held at the Howard Johnson's in Westbury.

Mr. Pierson indicated that the excess waste caused staging point and landfill problems. In addition, difficulty arose with the compact baler at the transfer station. Pierson testified that DeGange offered proposed solutions for a number of these problems, but his ideas were rejected by McDonald.

And finally, he reiterated that he stood ready to do whatever was necessary to advance the Oyster Bay projects, but was denied the opportunity to do so by the overbearing conduct of Willets which isolated him and DeGange from the operation.

#### j. *Louis DeGange.*

The final rebuttal witness was plaintiff DeGange. He testified that at a meeting held at Howard Johnson's in late Spring of 1986, the initial transportation problems were discussed, with the consensus being that they were caused by "too much waste." At that meeting—which was attended by plaintiffs, as well as Tully, Cameron, McDonald and Irwin—DeGange's recommended solutions were reportedly overridden by McDonald, who proposed other alternatives which proved to be unsuccessful.

The above is a synopsis of the trial testimony of each of the witnesses.

#### 3. *Findings of Fact re-Disputed Matters.*

Part of the findings of fact are set forth herein at pages 2 through 6. Following the format established at page 6, the Court's further findings are being presented at this juncture, now that a synopsis of the trial testimony has been provided.

These findings are as follows:

Shortly after the Oyster Bay contract was awarded, problems developed. These problems were traceable, in large measure, to an unexpected high volume of refuse being generated from Oyster Bay, and difficulties in implementing the transportation plan developed by the Haulage Group.

As a result, Willets unilaterally decided to change the "game plan." No longer content to simply provide the necessary bonds for the project, and to exercise some type of undefined general oversight, it decided to take over the performance of the work called for under the Oyster Bay contract. It did so by excluding all members of the Haulage Group from the project, except Haulage Enterprises (as the one member able to contribute major financial resources) and Cameron.

Plaintiffs did not abandon the project as defendants allege. Rather they were improperly bypassed by Willets, which obviously concluded at an early stage that it had unwisely joined forces with plaintiffs. Throughout the relevant time frame (*i.e.* between February 10, 1986 and the execution of the Release Agreement in August of 1987) plaintiffs remained ready, willing and able to perform their respective contractual obligations.

Haulage Enterprises and Willets continued their joint venture until DiMatteo's corporation became unable to invest additional funds in the then losing enterprise. That, coupled with Haulage Enterprises's failure to furnish a bond or letter of credit in favor of Willets, led to the execution of August 19, 1987 Release Agreement.

The August 1987 agreement not only terminated the contractual relationship between the defendants, but also served to terminate

the rights of the plaintiffs under the February 1986 agreement, given their status—together with Haulage Enterprises—as members of the Haulage Group.

In conclusion of this section of the memorandum, most of the trial testimony was essentially unchallenged. The major factual controversy is whether the plaintiffs abandoned or were improperly banished from the Oyster Bay project. As noted, the Court has found the latter to be the case.

Before discussing the various legal issues involved, attention will be directed to the positions urged by the respective parties. Parenthetically, Haulage Enterprises did not submit a post-trial memorandum, and its participation in the trial consisted primarily of underscoring the provision in the August 19, 1987 Release Agreement in which Willets agreed to indemnify Haulage Enterprise for any monies it may be required to pay plaintiffs. Accordingly, only the positions of the plaintiffs, and of the defendant Willets, will be outlined in the next section of this opinion.

## PLAINTIFFS' POSITION

The plaintiffs' position is that both of them—as members of the Haulage Group—devoted approximately six months prior to February 10, 1986, developing the Oyster Bay bid. Mr. Pierson testified that he coordinated those efforts, as well as, *inter alia,* determined the projected labor and equipment costs. Plaintiff DeGange's primary function was to arrange for landfills to receive the waste.

It is their view that the primary, if not sole consideration for each being entitled to $1 per ton under the February 10, 1986 Agreement, is to be found in their pre-bid efforts. Moreover, to the extent they were required to perform any services after the Oyster Bay contract was awarded, they would have done so had they not been banished from the project by Willets.

Plaintiffs also argue that their rights to $1 per ton were independent of Haulage Enterprises's contractual obligations and, accordingly, unaffected by any claimed breach by Haulage, or by the August 1987 Agreement between the two corporations.

## DEFENDANT WILLETS'S POSITION

The Willets's position is stated on pages 5–8 of its post trial brief, thusly:

1. The February 10, 1986 Agreement (Ex. 1) is clear and unambiguous and ... parol evidence may not be permitted to alter or contradict the agreement.

2. The only parties to the Agreement were Willets Point and Haulage.

3. Under the agreement Haulage Enterprises and its professional consultants were to perform all of the work required by the Oyster Bay contract (pp. 216–217, 498–500).

4. Haulage was required under the agreement to secure payment and performance bonds for one-half of the penal sum required by the Oyster Bay contract to assure Willets Point that Haulage would assume one-half of Willets'[s] liability to perform the Oyster Bay contract (Ex. 1, ¶ 6).

5. Plaintiffs Pierson and DeGange are not parties to the agreement, but at best are third-party beneficiaries.

6. The professional fees to be paid to Mr. Pierson were for legal services (Ex. 1, ¶ 6[c] ).

7. The professional fees to be paid to Mr. DeGange were for Transportation Consultant services (Ex. 1, ¶ 6[d] ).

8. The payment[s] to Mr. Pierson and Mr. DeGange of professional fees were only for services *to be* rendered in the performance of the Oyster Bay contract (Ex. 1, ¶ 7).

9. Both Mr. DeGange and Mr. Pierson abandoned the project (pp. 550, 563).

10. The failure of Haulage to provide the requisite bonds or, in lieu thereof, a letter of credit, was a material breach by Haulage of the agreement, and a failure of consideration that relieved Willets Point of any obligation under the February 10, 1986 agreement to any member of the Haulage Group, including plaintiffs.

11. The termination of the February 10, 1986 agreement on August 19, 1987 also terminated any rights that plaintiffs might have had under the February 10, 1986 agreement.

12. The fee for legal services set forth in paragraph 6(c) of the agreement was improper and excessive under The Disciplinary Rules of The Code of Professional Responsibility of the State of New York. See, DR 2–106.

13. The fee for legal services set forth in paragraph 6(c) of the agreement is void as against public policy because it constitutes a nonrefundable fee that is unrelated to the value of the legal services rendered. *Matter of Cooperman*, 83 N.Y.2d 465, 611 N.Y.S.2d 465, 633 N.E.2d 1069 (1994).

14. It was improper for Mr. Pierson as a lawyer to enter into a business relationship with a client without advising the client to seek other counsel for independent advice concerning such relationship. DR 5–104, *Matter of Edward W. Dietrich*, 192 A.D.2d 19, 600 N.Y.S.2d 550, 4th Dept., 1993.

15. The money paid to Mr. DeGange and Mr. Pierson for services performed in connection with the Oyster Bay project was fair and reasonable and constituted full payment for such services.

### DISCUSSION

Although many of the material facts in the present case are not in dispute, the legal issues raised are multiple and complex. The complexity is traceable in large measure to the apparently hurried manner in which the February 10, 1986 Agreement was drafted by one of the members of the Haulage Group (to wit, attorney and co-plaintiff Pierson), coupled with the fact that it was not reviewed by an attorney representing the adverse party, *viz.* Willets, prior to its execution. Unfortunately, that four page instrument is the sole writing which delineates the rights and obligations of the present litigants regarding a project which ultimately generated gross revenues in excess of $60,000,000.

Pierson had been admitted to the bar for only three years prior to the time he apparently endeavored to represent all of the parties involved, including himself. Not surprisingly, the parties now voice conflicting views as to the meaning of many of its significant terms. The contract's ambiguity is the subject of the next topic to be discussed, *i.e.* the parol evidence rule.

### 1. *Parol Evidence.*

Subject matter jurisdiction in the present case rests on diversity of citizenship. The contract was executed in New York, and was to be substantially performed in this jurisdiction. The parol evidence rule is substantive, rather than procedural in nature. *Fogelson v. Rackfay Const. Co.*, 300 N.Y. 334, 90 N.E.2d 881 (1950); *see generally* 58 N.Y.Jur.2d, Evidence and Witnesses, § 557. Accordingly, the New York law of parol evidence is applicable. *Bird v. Computer Tech., Inc.*, 364 F.Supp. 1336, 1343 (S.D.N.Y.1973).

▉ The parol evidence rule provides that an "instrument clear in its terms and purporting to express the entire agreement of the parties cannot be contradicted, varied or explained by what was communicated between the parties prior to, or at the time of the execution of the instrument." 58 N.Y.Jur.2d *Evidence and Witnesses* § 555; *see also* 29A Am.Jur.2d *Evidence* § 1092. However, under New York law, extrinsic evidence is admissible to resolve ambiguity in a contractual term or provision. *Tom Doherty Assocs. v. Saban Entertainment*, 60 F.3d 27, 36 (2d Cir.1995). Such ambiguity, and the concomitant need for extrinsic interpretative evidence, is found in, *inter alia*, the portions of the February 10, 1986 agreement which describe the obligations of plaintiffs.[4]

---

4. Willets's trial objections to the introduction of parol evidence were overruled. As a result, such evidence is part of the record. However, defense counsel was advised that if they elected to brief the issue in their post trial submissions, the Court would revisit the matter. Counsel has availed themselves of that opportunity. The Court, however—after perusing the materials submitted—abides by its original rulings for the reasons discussed in the text.

With respect to DeGange, what is embraced within the term "transportation consultant services?" *See Rudman v. Cowles Communications, Inc.,* 30 N.Y.2d 1, 330 N.Y.S.2d 33, 280 N.E.2d 867 (1972). "*Rudman* undertook to perform 'such executive and administrative services in the educational publishing operations of ... [the defendant] or its wholly-owned subsidiaries as shall from time to time be reasonably assigned to him by the Company's Board of Directors....' " *Id.* at 37, 280 N.E.2d at 871. Judge Breitel, writing for the Court of Appeals, found that parol evidence was admissible because "the broad language in the agreement was patently ambiguous in referring, without other specification, to executive and administrative responsibilities." *Id.* at 40; *cf. Yonkers Racing Corp. v. Off–Track Betting,* 159 A.D.2d 615, 552 N.Y.S.2d 670, 674–75 (2d Dep't 1990).

Here, as in *Rudman,* the broad, conclusory terminology used to describe DeGange's contractual obligations calls for extrinsic evidence. What did the parties intend that he would be required to do, and under what circumstances, to be entitled to $1 a ton in compensation?

As to Pierson, the term "legal services," while more specific, is similarly imprecise to the extent of being ambiguous. Such cryptic terminology requires interpretation to determine the intent of the parties. What legal services is he to perform? That question cannot be answered without extrinsic evidence, for the agreement is devoid of specificity, including any reference to an industry, or other outside standard, which might shed light on the type or extent of legal services contemplated. Moreover, the phrase "[t]his shall represent payment for legal services"— absent clarification—certainly would permit the inference that it was meant to cover Pierson's prior, as well contemporaneous and subsequent legal services. Such an inference would not appear to be inconsistent with paragraph 7 of the agreement which provides that "[a]ll costs in connection with the bidding, up to the date of submittal shall be an individual charge of the party incurring the same and shall not be considered a cost of the work under the Contract". Contrary to the position urged by Willets, simply agreeing to forego reimbursement for costs would not be inconsistent with a contemporaneous understanding that compensation was to be received for services previously rendered, should the bid prove successful.

Parol evidence is also needed to address the ambiguity created by the contract's format, particularly with respect to paragraph 6. Why were the plaintiffs specifically named—along with the other members of what we now know as the "Haulage Group"—in paragraph 6, although none is a named party or signatory to the agreement? How is paragraph 6 to be interpreted consistent with the intent of the parties as it existed in February of 1986?

In conclusion of this point, the terms "legal services" and "transportation consultant services" are ambiguous. Moreover confusion and ambiguity arises from a comparison of paragraph 6 with the remainder of the agreement. Accordingly, the use of parol evidence is warranted.[5]

Attention will now be directed to the impact of extrinsic evidence on the position of each of the plaintiffs.

a) *Impact of Parol Evidence on Claim of Plaintiff DeGange.*

DeGange's position was not markedly altered by the receipt of parol evidence.

■ As a member of the Haulage Group, he was entitled to the agreed-upon compensation following Willets's bid being accepted. He is not—contrary to Willets's position—a stranger to the February 10, 1986 Agreement. The evidence indicates that Haulage

---

5. Given the Court's decision to consider extrinsic evidence for the reasons indicated above, only brief mention will be made of two other grounds urged by plaintiffs for admission of such evidence, *viz.* to clarify consideration, and to complete the partially integrated agreement. Suffice it to say that there is supporting authority for each of the two grounds, neither of which will be furthered discussed as being essentially academic at this point. *See Bird,* 364 F.Supp. at 1343 (admissibility of parol evidence to illuminate the consideration), and *Saxon Capital Corp. v. Wilvin Assocs.,* 195 A.D.2d 429, 600 N.Y.S.2d 708 (1st Dep't 1993) (parol evidence admitted to supplement a partially integrated contract).

Enterprises was impliedly designated by the Haulage Group as the team member who was to be a named party to that contract. As such, Haulage Enterprises was both a principal in acting for itself, as well as an agent for the other team members, all of whom participated in the contract negotiations, were deemed pivotal to the project's success at the time, and are specifically named in paragraph 6 of the instrument. *See generally* 3 N.Y.Jur.2d *Agency*, §§ 270, 272. Moreover, DeGange, Pierson and Longo, have been paid a total of $75,000 by Willets. Plaintiffs convincingly testified that those payments were for services rendered pursuant to the February 10, 1986 Agreement. Willets offered no countervailing evidence.

■ Clearly, DeGange is entitled to bring the present action, even though he was not a signatory to the February contract. Of course, that conclusion presupposes that he performed as contractually required. However, as noted previously, the Court has found that DeGange was improperly excluded from the project, and remained ready, willing and able to perform his duties at all relevant times.

■ DeGange is entitled to receive the $1 a ton figure, regardless of whether such sum was intended by the parties to cover pre-bid and post-bid services, or only services within the latter category. Similarly, it develops that the specific tasks that the parties intended to be included within the term "transportation consultant services" is not significant for present purposes because the adequacy of consideration—as distinct from its presence—does not affect DeGange's right to compensation. *Apfel v. Prudential–Bache Sec., Inc.*, 81 N.Y.2d 470, 600 N.Y.S.2d 433, 435, 616 N.E.2d 1095, 1097 (1993) ("Under the traditional principles of contract law, the parties to a contract are free to make their bargain, even if the consideration exchanged is grossly unequal or of dubious value.... Absent fraud or unconscionability, the adequacy of consideration is not a proper subject for judicial scrutiny.") (citations omitted).

In sum, DeGange's position is not affected by the Court's considerations of parol evidence, except to the extent—as will be discussed momentarily—that such evidence will serve to terminate his entitlement to $1 a ton as of August 19, 1987 (*i.e.* the date defendants "parted company,") rather then as of August of 1988 when the Willets—Oyster Bay relationship ended.

### b) *Impact of Parol Evidence on Claim of Plaintiff Pierson.*

Pierson's situation is more complicated than that of his co-plaintiff.

The admission of parol evidence did not affect DeGange's right to $1 a ton, although it did influence the duration during which such payments would be made.

Pierson, like DeGange, may use the extrinsic evidence in the record to explain what the parties meant in defining his role. He seeks to have his pre-bid non-legal services identified as the essential consideration for his promised compensation. At trial, he claimed an entitlement to such payments upon the delivery of his pre-bid work product to the joint venture in February of 1986. What happened thereafter, or so his argument continues, should not affect his rights to payment.

■ Pierson relies on the parol evidence introduced at trial to support his expansive interpretation of the term "legal services." However, as explained by Judge Winter in *Tom Doherty Assocs.*, 60 F.3d 27 at 36:

[E]xtrinsic evidence is available only to resolve conflicting, plausible interpretations of a word, not to change the word's meaning.

"Legal services," therefore, cannot be interpreted to include Pierson's pre-February 1986 "non-legal services."

Pierson advances a second argument in his effort to prove that the consideration for the promised payments was his pre-bid services. That argument is that the Agreement is incomplete in its recitation of consideration, and that parol evidence may be used to fill that void.

Does the extrinsic evidence indicate that he was to be paid essentially for his work in formulating the bid proposal? Is that what the parties intended but Pierson, by inadver-

tence, failed to include in their agreement? The extrinsic evidence in that regard is ambiguous at best.

It may be that Pierson and, incidentally, DeGange, subjectively believed that to be the case. However, insufficient proof surfaced during the trial to establish to the Court's satisfaction that plaintiffs' perceptions were objectively reasonable, or were, in fact, shared by Willets, or by Haulage Enterprises for that matter.

Had the relationship between Willets and the Haulage Group materialized as originally envisioned, the Haulage Group would have been required to do all the work called for under the Oyster Bay contract. (*See* Ex. 1, ¶¶ 3–4.) Willets's role was limited to obtaining the necessary bonding. Neither Willets nor the Haulage Group could do anything *vis a vis* this multi-million dollar project without the other. Under the circumstances, the amounts per ton figures set forth in the contract for the various Haulage Group members do not seem excessive, even if the consideration is viewed as solely prospective in nature. Accordingly, the significant amounts involved do not support Pierson's position that the payments had to be, at least in part, for pre-bid services. To the extent Pierson is correct in claiming that his post-contract activities would be minor, the payments to him could have been justified based on his membership in the group whose involvement was considered as pivotal to the project's success. In any event, Pierson has failed to prove, even with the aid of extrinsic evidence, that the parties intended to compensate him for his pre-bid services, and that such a provision should now, in effect, be inserted into the February 10, 1986 Agreement to make it complete.

In sum, Pierson has failed to establish under either of his two arguments (*viz.* ambiguity of the term "legal services," or incompleteness of the contract) that his fee—consistent with the intention of the parties—was earned upon the delivery of his pre-bid work product to defendants.

The question now arises as to whether Pierson may, nonetheless, recover $1 a ton for legal services that were to be rendered *after* the agreement was executed. Pierson, like DeGange, was improperly isolated from the project by Willets. Such being the case, his lack of activity does not preclude him from recovering for legal services that he would have provided had he been permitted to do so. The likely parameters of those prospective services, however, were delineated by Pierson. He testified that his legal services were a minor component of his total contribution to the joint venture, and that his anticipated future legal services were to be meager. The Court accepts this testimony as accurate.

As noted previously, adequacy of consideration would not be addressed in a typical commercial dispute. Indeed, this issue was not even factually broached regarding DeGange. But it must be discussed as to Pierson's claim. His status as an attorney brings both ethical, and adequacy of consideration, factors into play.

Proceeding *seriatim,* Pierson's representation of both Willets and all members of the Haulage Group, including himself, was ethically questionable at best, given the actual or potential nature of their divergent interests. Code of Professional Responsibility EC5–19 [6] ("A lawyer may represent several clients whose interests are not actually or potentially differing. Nevertheless, the lawyer should explain any circumstance that might cause a client to question the lawyers undivided loyalty."); *see also* EC5–14. Or if he did not represent Willets, he should have advised its Chief Executive Officer, Tully, to have the proposed agreement reviewed by his attorney prior to its execution in view of its complexity and the financial magnitude of the venture.

Regarding the issue of adequacy of consideration, plaintiffs' counsel argues:

> . . . even if Pierson is to recover what the defendants promised him in the capacity of

**6.** References in the text to "EC" (Ethical Considerations) and "DR" (Disciplinary Rules) have been taken from the Code of Professional Responsibility as set forth in N.Y.Jud.Law (Book 29). As a New Jersey practitioner, it may be that Mr. Pierson is bound by the code of that State, and such code differs to some extent from New York's. However, counsel has confined their attention to the New York's Code and, accordingly, the Court has done likewise.

an attorney, he is entitled under New York law to full recovery. Assuming arguendo that Pierson is suing for legal fees, those fees are clearly *contingent* in nature and he is not relegated to an hourly rate nor to quantum meruit.

(Pls.' Post–Trial Br. at 36.)

■■■ However, is this a contingent fee situation within the purview of the decisions cited by plaintiffs' counsel, which include *De-Graff v. McKesson & Robbins, Inc.*, 31 N.Y.2d 862, 340 N.Y.S.2d 171, 292 N.E.2d 310 (1972) and *Angoff v. Goldfine*, 270 F.2d 185, 191 (1st Cir.1959). The answer to that question is "no," whether Pierson is seeking compensation for pre-bid services, or post-bid services.

Let us consider the first scenario. Pierson failed to establish that the parties intended in February of 1986 to compensate him for services—non-legal and otherwise—which occurred prior to that time. That finding of fact invalidates the related contingency argument, to wit, that he would only be paid for such services if the bid was successful for, again, he was not to be paid for those services in any event.

If the contingency argument is considered solely with respect to legal services provided after the Oyster Bay contract was awarded to Willets, the same result is reached.

The awarding of the contract triggered his right to a dollar a ton. Is that arrangement a contingent fee? The answer is to be found in an analysis of the concept underlying contingent fees which is synopsized well in *De-Graff*, 340 N.Y.S.2d at 176–79, 292 N.E.2d at 315–318, thusly: "If there is a contingent fee, the lawyer should properly receive compensation in a successful suit for the risk of no fee in an unsuccessful suit." *Id.* at 177, 292 N.E.2d at 316.

Inherent in a contingent fee arrangement is the attorney being paid after the fact for his or her *prior* services from monies typically generated via the successful conclusion of the litigation. Pierson, on the other hand, is seeking hundreds of thousands of dollars with respect to legal services which were to be provided *after* the contractual contingency occurred, not before. In essence, the occurrence of the contingency in the present case

simply served to activate the fee arrangement for legal services to be provided thereafter. Pierson's contingency fee argument is not a legitimate basis for the relief sought.

However, that conclusion does not end the inquiry. If there was a reasonable relationship between the sum sought and the legal services that would have been rendered by Pierson but for Willets's improper actions, it would appear that he should be awarded the same amount as DeGange. However, unlike DeGange, the Court is required to address the relationship between the claimed legal fee and the corresponding services, particularly since Pierson drafted the language involved independent of any input or review by counsel representing Willets. And, as mentioned previously, he has told us that his prospective legal services were to be essentially *de minimis*. Under the circumstances, the Court agrees with Willets that "the money paid to ... Mr. Pierson for [his post-bid] services performed in connection with the Oyster Bay project was fair and reasonable and constituted full payment for such services." (Willets's Br. After Trial at 8, ¶ 15.) If the Court were to hold otherwise, Pierson would be entitled to a fee in the five figure per hour range which, *inter alia*, would be violative of the Code of Professional Responsibility. *See* EC2–17 ("A lawyer should not charge more than a reasonable fee.... [A]n excessive charge abuses the professional relationship between lawyer and client"); DR2–106[A] ("A lawyer shall not enter into an agreement for, charge or collect an illegal or excessive fee.") *See generally* discussion of nature of attorney-client relationship in *Matter of Cooperman*, 611 N.Y.S.2d 465, 633 N.E.2d 1069.

In sum, Pierson has failed to prove that additional monies are due.

2. *Haulage's Failure to Secure Payment and Performance Bonds for One-half of the Sum Required by the Oyster Bay Contract Does not Preclude Plaintiffs From Seeking Monies Pursuant to the February 10, 1986 Agreement; Moreover, Neither Plaintiff has Right to Payment Beyond August 19, 1987, i.e. Date of Release Agreement.*

Reference to the February 10, 1986 Agreement indicates that Haulage was required to

"secure and execute a performance bond and payment bond ... for the amount of one-half of the performance bond required under the contract." The Agreement further provided that these bonds were to be delivered to Willets if Willets was awarded the Oyster Bay contract. No further clarification appears as to when such bonds were to be delivered, thereby presumably meaning that delivery was to occur within a reasonable time.

■ Defendants maintain the failure of Haulage to provide the required bonds, or in lieu thereof, a letter of credit, was a material breach by Haulage Enterprises that relieved Willets of any obligation under the February 10, 1986 Agreement, including any obligations to pay either of the two plaintiffs.

Plaintiffs counter by arguing that the bond requirement was not a condition to Willets's obligations coming into play, but rather merely a promise, the violation which would entitle Willets to sue Haulage for damages. Plaintiffs also urge that any obligations that Haulage Enterprises had under the agreement were separate and independent and "not applicable to nor binding upon plaintiffs under the February 10, 1986 contract."

■ Proceeding in reverse order, the evidence indicates that there was a definite linkage between Haulage Enterprises, DiMatteo, DeGange, Pierson, Longo and Cameron. As noted previously, each of the individuals was a member of the Haulage Group. That group prepared the bid proposal, and was to perform the work necessary for Willets to discharge its obligations to Oyster Bay if the bid was accepted. Granted, paragraph 4 of the February 10, 1986 Agreement provides that "if awarded the contract Willets shall name Haulage [Enterprises Corporation] as subcontractor for the performance of the Contract...." However, the evidence—including the listing of the duties and compensation for Cameron, Longo, Pierson and DeGange in paragraph 6 of the Agreement—establishes that DiMatteo's corporation, and the individual team members were an integrated unit and were so viewed by all parties in February of 1986. Accordingly, Haulage Enterprises's failure to obtain a bond in favor of Willets, or a letter of credit, is not separate and apart from the plaintiffs' contractual rights. The February 10, 1986 Agreement was a single contract, not a series of separate, or divisible agreements contained in one writing. *Nederlandse Draadindustrie NDI, B.V. v. Grand Pre–Stressed Corp.*, 466 F.Supp. 846, 852 (E.D.N.Y.) ("In determining whether a contract is divisible or entire, the controlling element is the intent of the parties, to be determined in light of the language employed by the parties and the circumstances existing at the time of contracting.") (citation omitted), *aff'd*, 614 F.2d 1289 (2d Cir.1979); *Matter of Wilson*, 50 N.Y.2d 59, 427 N.Y.S.2d 977, 405 N.E.2d 220 (1980).

■ However, the mere fact that there is a nexus does not preclude recovery for the services rendered during the course of the joint venture. Approximately sixteen months elapsed between the time Willets was awarded the Oyster Bay contract and the signing of the Release Agreement on August 19, 1987. During that time, Willets and Haulage discussed the preparation of the necessary subcontract, and Willets insisted that Haulage provide the required bond or letter of credit to protect Willets. However, while these discussions were being had, Willets and Haulage continued to operate as joint venturers in keeping with their contract.[7] Willets never claimed that the Feb-

---

7. Willets did not waive its right to a bond, or letter of credit, by proceeding with the joint venture absent either of those items being furnished by Haulage Enterprises because it persisted in demanding performance throughout the relevant time frame. Clearly, Willets intended to enforce its rights. *Cf. T.G.I. East Coast Constr. Corp. v. Fireman's Fund Ins. Co.*, 600 F.Supp. 178, 181–82 (S.D.N.Y.1985). The promises survived, although the commencement of the project by Willets and Haulage Enterprises obviously vitiated Willets's claim that the performance of the promises was a condition precedent to the contract becoming viable. *See Merritt Hill Vineyards Inc. v. Windy Heights Vineyard, Inc.*, 61 N.Y.2d 106, 472 N.Y.S.2d 592, 596, 460 N.E.2d 1077, 1081 (1984) for a discussion of the distinction between a contractual "promise" and a "condition." Similarly, the fact that no written subcontract between the defendants was ever signed is not significant given the joint performance of the Oyster Bay contract by the parties over a period of sixteen months.

ruary 10, 1986 Agreement was not in effect. Under the circumstances, it may not do so now in an effort to avoid its undischarged obligations to DeGange, or to recoup monies paid to Pierson.[8]

In any event, Willets and Haulage Enterprises stayed the course and, in the process, lost money. Each company was required to devote considerable capital to the project, consistent with the contractual provision that they would share profits and losses. However, in 1987 Haulage was no longer financially able to make additional contributions, causing a further breach of its obligations. In that regard, it should be noted that Haulage Enterprises was the most and, perhaps only, indispensable member of the Haulage Group, for it was the monied member. Remember that Willets's obligation under the February 10, 1986 Agreement was simply to provide the necessary bonds for the Oyster Bay projects, and to share in any resulting profits or losses. Therefore, the initial costs associated with the venture presumably were to be borne by Haulage Enterprises, with the expectation that future costs could be funded from profits.

Willets did not resort to threats or litigation to oust Haulage Enterprises, following its material breaches of contract. Such tactics were not required. Rather, the parties agreed to terminate their relationship via the execution of the August 19, 1987 Release Agreement, with Willets paying $655,025 to Haulage Enterprises as a return of capital invested. When Willets and Haulage parted company, plaintiffs' rights—as members of the Haulage Group—also terminated.

In Point II of Defendant Willets's Brief After Trial, counsel employs a third-party beneficiary analysis to issues presently under discussion. *See generally Burns v. Lindner*, 59 N.Y.2d 314, 464 N.Y.S.2d 712, 451 N.E.2d 459 (1983); *Alicea v. City of New York*, 145 A.D.2d 315, 534 N.Y.S.2d 983 (1st Dep't 1988). However, assuming that plaintiffs may properly be labeled as "third-party beneficiaries," the same result is reached under that approach as is detailed above, to wit,

that while plaintiffs have standing to sue under the February 10, 1986 Agreement, their corresponding rights to payment ended on August 19, 1987. The signatories to the February 10, 1986 Agreement understood, as did the plaintiffs, that the obligation to pay $1 a ton for services to be rendered would terminate upon the dissolution of the joint venture between Willets and Haulage. Plaintiffs had, consistent with that understanding, a vested right to payment for services rendered prior to August 19, 1987. However, no claimed detrimental reliance prior to notification, *see* Restatement (Second) of Contracts § 311, or other ground has been advanced by plaintiffs to justify payments beyond that date. As a member of the Haulage Group, each plaintiffs' right to $1 a ton ceased upon Haulage Enterprises material breaches of contract and concomitant execution of the Release Agreement.

In sum, plaintiff DeGange is entitled to $1 a ton until August 19, 1987. Plaintiff Pierson has already received the sums to which he is entitled, as previously explained.

3. *Neither Plaintiff Abandoned his Rights, nor Breached his Duties Under the February 10, 1986 Agreement.*

The questions of abandonment, and breach of contract by plaintiffs are interconnected and, thus, will be discussed together.

Willets maintains that plaintiffs abandoned their rights under the February 10, 1986 Agreement by distancing themselves from the project as problems arose, and losses began to mount. It is said they were unavailable to such a degree that they refused even to return telephone calls.

Plaintiffs response is twofold. Firstly, it is underscored that the burden of proving abandonment rests with the party which makes that assertion, *i.e.* Willets in this case. And secondly, they challenge the factual predicate for the abandonment claim.

Pierson and DeGange testified that they were unceremoniously excluded from the Oyster Bay project by the wrongful acts of

---

8. It will be recalled that Willets has acknowledged in its post-trial brief the sums paid to

Pierson were properly paid. *See supra* at 35.

Willets, but yet remained ready, willing and able to perform their duties as outlined in the February 10, 1986 Agreement. As noted previously, the Court has accepted as credible plaintiffs' evidence in this regard, and rejected that proffered by defendants.

 The mere fact difficulties in performance occurred during the course of the joint venture—even if traceable to plaintiffs' work product—does not, in and of itself, evidence a breach of contract. A contract that calls for the performance of services requires only that the obligated party perform in a objectively reasonable manner under the circumstances. Infallibility is not to be expected. *Lunn v. Silfies,* 106 Misc.2d 41, 431 N.Y.S.2d 282, 284 (1980). Moreover, to the extent DeGange was a "consultant," the fact defendants chose to ignore his advice does not affect his right to recovery under the contract. *Teplitsky v. City of New York,* 133 N.Y.S.2d 260, 261 (1954).

The Court finds that neither plaintiff abandoned his rights under the February 10, 1986 Agreement, nor breached any of its provisions.

4. *Defendant Haulage Enterprises, as a Joint Venturer With Willets, is Also Liable to DeGange, and May Not Recoup From Pierson Monies Previously Paid.*

As a joint venturer with Willets, Haulage Enterprises is jointly responsible for Willets's actions in the present context. N.Y.Partnership Law § 26(a)(2). No claim has been asserted by Haulage Enterprises suggesting anything to the contrary, except insofar as reliance is placed upon an indemnification provision of the August 19, 1987 Release Agreement. That Agreement is the subject of the next section of this opinion.

5. *Willets is Liable to Haulage Enterprises For Any Monies the Latter Corporation Must Pay As a Result of the Present Lawsuit.*

The relevant portions of the previously identified Release Agreement of August 19, 1987, between Willets and Haulage Enterprises, are:

Agreement made August 19th, 1987 by and between Willets Point Contracting Corporation, a New York corporation having its principal place of business at 127–50 Northern Boulevard, Flushing, New York, 11368 (Willets) and Haulage Enterprises Corporation, a New York corporation having its principal place of business at 633 Dickens Avenue, Westbury, New York (Haulage).

The parties in February, 1986 entered into a pre-bid agreement ("Agreement") with regard to Town of Oyster Bay Contract TBI–85–361 ("The Contract").

The parties agree to declare said pre-bid agreement null and void.

· · · · ·

5. Willets agrees to indemnify Haulage for any claims by parties to the agreement.

The indemnification provisions of paragraph 5 include the present plaintiffs. Accordingly, Willets will be required to pay to Haulage Enterprises any sums that Haulage must pay pursuant to this opinion.

## CONCLUSION

For reasons previously discussed:

(1) Plaintiff DeGange is entitled to be paid $1 a ton from the date of the Oyster Bay contract until the defendant corporations exchanged releases on August 19, 1987, less partial payments received from defendants through Pierson.

(2) Plaintiff Pierson has been paid for his post-bid legal services, and is entitled to no additional compensation.

(3) Defendant Willets has abandoned its recoupment counterclaim against Pierson for $75,000 via, *inter alia,* its previously mentioned post-trial statement that "the money paid to ... Mr. Pierson for services performed in connection with the Oyster Bay project was fair and reasonable and constituted full payment for services." (Willets's Br. After Trial at 8, ¶ 15.)

(4) Defendants Willets and Haulage Enterprises are jointly liable to plaintiff DeGange.

(5) Haulage Enterprises has established its right to contractual indemnification from

Willets for any sums it must pay to De-Gange.

The above constitutes the Court's findings of fact and conclusions of law. Judgment shall be entered accordingly. In that regard, the parties stipulated as to total tonnage hauled under the Oyster Bay—Willets contract. No corresponding figure was provided for the period ending August 19, 1987. Counsel shall forthwith confer so that the appropriate figure may be inserted into the judgment.

SO ORDERED.